**Bruce BABBITT, Secretary of the Interior, Appellant,**

v.

**OGLALA SIOUX TRIBAL PUBLIC SAFETY DEPARTMENT, Appellee.**

**No. 99–1033.**

United States Court of Appeals, Federal Circuit.

Oct. 27, 1999.

Leslie V. Batchelor, Attorney, Civil Division, Commercial Litigation Branch, Department of Justice, of Washington, DC, argued for appellant. With her on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Kirk T. Manhardt, Assistant Director.

Michael P. Gross, Law Offices of Michael P. Gross, of Santa Fe, New Mexico, argued for appellee. Of counsel was Carl Bryant Rogers, Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, LLP, of Santa Fe, New Mexico.

Before MICHEL, PLAGER, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Additional views filed by Circuit Judge GAJARSA.

PLAGER, Circuit Judge.

The United States Department of the Interior Board of Contract Appeals ("IBCA" or "Board") granted summary judgment against Bruce Babbitt, Secretary of the Interior ("Government" or "Interior"), and in favor of Oglala Sioux Tribal Public Safety Department ("Oglala"). *See Appeal of Oglala Sioux Tribal Pub. Safety Dep't*, IBCA No. 3680–97, 98–2 BCA 29,833, 1998 WL 347090 (Interior B.C.A. June 24, 1998). In its appeal to the Board, Oglala claimed entitlement to all of its indirect (contract support) costs on its 1995 fiscal year self-determination contracts under the Indian Self–Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450–450n (1994); Interior had provided only about 92% of the contract amount for such costs due to a shortage in congressional appropriations. The IBCA concluded that Oglala was entitled to full funding. The Board reasoned that Interior was legally bound to provide Oglala with full indirect costs notwithstanding Congress's reduced lump sum appropriation for ISDA contracts and an express congressional cap on funds for indirect costs. Because the ISDA explicitly makes funding· of ISDA contract indirect costs subject to the availability of appropriations, and because Interior had no choice but to comply with the statute, we reverse the decision of the Board and remand the case.

## BACKGROUND

This appeal is one of a number of disputes stemming from the ISDA. The ISDA's stated purpose is to allow Native American tribes to operate their own federal programs directly. Under the ISDA, a tribe and the Secretary of the Interior enter into a "self-determination contract," which incorporates the provisions of the model contract contained in the ISDA text. *See* 25 U.S.C. § 450*l* (a), (c) (1994). The ISDA requires the Department of the Interior's Bureau of Indian Affairs ("BIA") to fund programs (base funding) and to fund indirect costs to self-determination contractors. The indirect cost rate is determined by annual negotiations with the Department of the Interior's Office of the Inspector General. The resulting rate is multiplied by the total direct cost base of a contractor's contracts for a particular fiscal year to calculate the indirect cost amount. Funding of ISDA contracts is dependent upon congressional appropriations.

Appellee, Oglala Sioux Tribal Public Safety Department, is a tribal organization which operates an ISDA contract for public safety on the Pine Ridge Reservation in South Dakota for the Oglala Sioux Tribe. Oglala has a multi-year ISDA contract with the BIA. For fiscal year 1995, Oglala incurred indirect costs of $1,313,840. Some of these indirect costs were expended prior to congressional appropriations for the fiscal year.

For fiscal year 1995, Congress appropriated $1.5 billion for the operation of Native American programs, "of which not to exceed $95,823,000 shall be for payments ... for contract support costs" for contracts authorized by the ISDA. *See* Interior Appropriations Act of 1995, Pub.L. No. 103–332, 108 Stat. 2499, 2511 (1994). Due to the cap in funding of contract support costs, the Secretary implemented a plan to allocate the available funds. *See* Distribution of Fiscal Year 1995 Contract Support Funds, 59 Fed.Reg. 55318 (1994). In the end, tribes that submitted timely proposals all received 91.74% of their indirect costs.

Oglala received 91.74%, which was $108,-506 less than the originally negotiated amount. After the contracting officer denied Oglala's claim for full funding of indirect costs, Oglala appealed to the IBCA.

The IBCA granted summary judgment to Oglala after the Government failed to show cause why this case differed from *Appeals of Alamo Navajo Sch. Bd., Inc., Miccosukee Corp.,* IBCA No. 3463, 98–2 BCA 29,832, 1997 WL 759441 (Interior B.C.A. Dec. 4, 1997), which involved the same legal issue.[1] In *Miccosukee,* the IBCA concluded that Interior was legally bound by the ISDA contracts to provide full indirect cost funding, despite specific congressional limitations on appropriations for indirect costs. *See Miccosukee,* No. 3464, slip op. at 45. The IBCA reached this conclusion on the basis of its reading of the ISDA and case law, independent of the Government's trust responsibilities to Native Americans. *See id.* at 51–52. Although Oglala's indirect costs suit involves a different fiscal year than that in *Miccosukee,* the IBCA reasoned that minor factual differences between the two cases failed to raise a genuine issue of material fact that would preclude summary judgment against the Government based on *Miccosukee. See Appeal of Oglala Sioux Tribal Pub. Safety Dep't,* No. 3680–97, slip op. at 2.

The Government appeals the IBCA's grant of summary judgment for Oglala. We have jurisdiction to hear this appeal under 28 U.S.C. § 1295 (1994).

## DISCUSSION

■ The grant of summary judgment is reviewed as a matter of law, to determine that no genuine issues of material fact exist when the record is read in the light most favorable to the non-moving party, and that the moving party is otherwise entitled to judgment on the law. *See Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1107 (Fed. Cir.1992). Conclusions of law are reviewed independently and without deference, *see Orlando Helicopter Airways, Inc. v. Widnall,* 51 F.3d 258, 262 (Fed.Cir. 1995); though, of course, we give careful consideration to the Board's legal conclusions in recognition of its "considerable expertise in construing government contracts," *West v. All State Boiler, Inc.,* 146 F.3d 1368, 1371 (Fed.Cir.1998).

■ On appeal the Government argues that Oglala has no statutory or contractual right to additional funding for its contract support costs because under the ISDA the requirement to fund such costs is subject to the availability of appropriations. As in any case of statutory interpretation, we begin with the language of the statute, specifically, 25 U.S.C. § 450j–1 (1994), entitled "Contract funding and indirect costs." Subsection (a) describes the amount of funds to be provided. For example, Interior is obligated to provide direct costs "not less than the appropriate Secretary would have otherwise provided for the operation of the programs . . . for the period covered by the contract." 25 U.S.C. § 450j–1(a)(1) (1994). In addition, Interior must supply "contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management. . . ." *Id.* § 450j–1(a)(2). The following subsection, 450j–1(b), describes reductions and increases in the

---

1. The appeals in both cases were heard together, and are decided together today. Before the IBCA, Miccosukee appealed the contracting officer's denial of full funding of its contract support costs, as well as the denial of full funding of its administrative cost grant ("ACG") for school operations programs. The Board consolidated Miccosukee's appeals with those of Alamo Navajo School Board, Inc., who claimed entitlement to full funding of its ACGs for its school programs. In *Miccosukee,* the Government is only contesting the Board's ruling as to contract support costs; thus, Miccosukee is the only appellee in that case.

amount of funds provided. This subsection concludes with the unequivocal statement that: *"Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations ...."* *Id.* § 450j–1(b) (emphasis added).

The language of § 450j–1(b) is clear and unambiguous; any funds provided under an ISDA contract are "subject to the availability of appropriations." The clause preceding this limitation, "[n]otwithstanding any other provision in this subchapter," further clarifies that other statutory language in the ISDA relied upon by Oglala, *see, e.g.*, § 450j–1(f) ("Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection(a)."), cannot trump this express restriction on ISDA funding.

Other sections of the ISDA indicate congressional intent to make ISDA funding subject to the availability of appropriations. For example, § 450j(c) sets the term of self-determination contracts and states "[t]he amounts of such contracts shall be subject to the availability of appropriations." Likewise, the model contract set out in the ISDA, which is contained in or incorporated by reference into each self-determination contract under the ISDA, specifies that "[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement...." *Id.* § 450*l* (c).

Oglala asks this court to use the general intent underlying the ISDA to trump the express language of the statute. There are two problems with following such an approach.

■ First, in the face of congressional under-funding, an agency can only spend as much money as has been appropriated for a particular program. *See Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1170–71 (Fed. Cir.1995) (citing 31 U.S.C. § 1341(a)(1)(A) (1994)). Thus, Interior properly allocated the $95,823,000 earmarked for contract support costs by giving eligible self-determination contractors 91.74% of their indirect costs. *See Ramah Navajo Sch. Bd., Inc. v. Babbitt,* 87 F.3d 1338, 1348–49 (D.C.Cir.1996) (explaining how a pro rata reduction scheme would effectuate the original statutory scheme of the ISDA and comply with congressional intent behind the 1995 Appropriations Act).

■ Second, if we accepted Oglala's selectively quoted legislative history as a clear congressional statement of intent that ISDA indirect costs must be fully funded, it would render the subject-to-appropriations language of § 450j–1(b) meaningless. It would exceed our judicial function to repeal the unambiguous language of § 450j–1(b) in such a fashion. *See West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 98–99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("The best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous ... we do not permit it to be expanded or contracted by the statement of individual legislators . or committees during the course of the enactment process."); *cf. Iselin v. United States,* 270 U.S. 245, 250–51, 46 S.Ct. 248, 70 L.Ed. 566 (1926) (reasoning that to supply an omission in a statute whose language was plain and unambiguous would transcend the judicial function). Instead, we must assume that Congress "says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, ... 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal citations omitted) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *see also United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103

L.Ed.2d 290 (1989) (applying the rule that if the statute's language is plain, then the "sole function of the courts is to enforce it according to its terms" (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))); *American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1379–81 (Fed.Cir.1999) (en banc) (Plager, J., dissenting-in-part). Furthermore, we decline to find that Interior's pro rata allocation of the capped appropriations providing Oglala 91.74% of its indirect costs for 1995 constitutes an absurd result. *See United States v. Missouri Pac. R.R. Co.*, 278 U.S. 269, 277, 49 S.Ct. 133, 73 L.Ed. 322 (1929) (enforcing the plain meaning of the provision since it leads to nothing impossible or plainly unreasonable).

■■■ The Supreme Court has cautioned, with respect to the interpretation of treaty language, that "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 505–06, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). Thus, even if we were to construe the agreement between Interior and the Oglala Tribe as analogous to a treaty, in the absence of ambiguity the agreement "must be interpreted according to [its] natural and ordinary significance," and only if the words are ambiguous, "then resort may be had to such evidence, written or oral, as will disclose [the parties' intent]." *United States v. Choctaw Nation*, 179 U.S. 494, 531, 21 S.Ct. 149, 45 L.Ed. 291 (1900). No such ambiguity exists here.

Oglala relies upon *New York Airways, Inc. v. United States*, 177 Ct.Cl. 800, 369 F.2d 743 (1966), to support its contention that it is entitled to full funding of contract support costs regardless of any congressional appropriation caps. New York Airways sued the Government for money allegedly due for transporting mail by helicopter. *See id.* at 744. As a certified carrier of mail, New York Airways was statutorily entitled to receive reasonable compensation in the form of fixed monthly payments, but funds earmarked for the mail service had been exhausted for the fiscal year, leaving New York Airways with an unpaid balance. *See id.* The *New York Airways* court concluded that the "mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *Id.* at 748 (citing *United States v. Vulte*, 233 U.S. 509, 49 Ct.Cl. 687, 34 S.Ct. 664, 58 L.Ed. 1071 (1914)). *New York Airways* involved a situation in which the Government, as a contracting party, had simply failed to appropriate and pay its unqualified contractual obligation. Oglala's situation differs fundamentally in that the ability of Interior to bind the Government contractually was expressly conditioned on the availability of appropriations.

The D.C. Circuit reached the same conclusion in *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1341–42, 1345 (D.C.Cir.1996) ("*Ramah I*"). The *Ramah I* court discussed § 450j–1(b) of the ISDA as part of its analysis of how much discretion the Secretary had to allocate indirect funds with respect to the 1995 congressional cap on the appropriation amount available for ISDA contract support costs. The court noted that the Secretary is "not required to distribute money if Congress does not allocate that money to him under the Act. The first part of the provision [§ 450j–1(b) ] says just that...." *Id.* at 1345. The court then concluded that despite a tribe's claim that it is entitled to the funds under the ISDA, if the money is not available, it need not be provided. *See id.* Thus, the D.C. Circuit found the language of § 450j–1(b) as clear as we do. *See id.* ("Thus, we read the subject-to-availability-of-funds provision to mean precisely what it says: the Secretary need

only distribute the amount of money appropriated by Congress under the Act. . . .").[2]

Oglala responds with a Tenth Circuit case in which the court concluded that self-determination contractors are entitled to full funding for all reasonable and necessary contract support costs. *See Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455, 1463 (10th Cir.1997) ("*Ramah II* "). But the shortfall in *Ramah II* was caused by Interior's Office of the Inspector General's inclusion of state program funds in the plaintiff's direct costs base for five self-determination contracts, which resulted in a lower (44.5%) indirect costs rate than the 48.1% rate that plaintiff had calculated (by excluding the state program funds). *See id.* at 1459. The *Ramah II* court reasoned that the inclusion of these state program funds in the direct cost base was improper because the state program funds did not include funding for indirect costs. *See id.* at 1463. Thus, the *Ramah II* court's holding only specifically prohibits adverse adjustments to the calculation of ISDA indirect costs stemming from non-funding of indirect costs by other state or federal agencies and does not address the problem in this case—congressional under-appropriation of funds.

 Oglala further argues that it relied to its detriment (by spending indirect cost money before it was appropriated) on the expectation that it would receive full indirect costs funding based on the entitlement language of ISDA § 450j–1(g). Such an estoppel claim requires that Oglala prove that its reliance was reasonable. *See Heckler v. Community Health Servs.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (citing Restatement (Second) of Torts § 894(1) (1979)). Although Oglala may have expected to receive full funding

of such costs based on past experience, the subject-to-availability-of-appropriations language present in § 450j–1(b) as well as in the model contract, § 450*l* (c), precludes a finding that Oglala's reliance was reasonable. The unequivocal statutory language prevents Oglala from asserting that it was entitled to full funding as a matter of right. *See id.* at 62, 104 S.Ct. 2218. In addition, even assuming that Oglala's reliance were reasonable, no estoppel may lie against the Government when the claim for payment out of public funds is contrary to a statutory appropriation. *See Office of Personnel Management v. Richmond,* 496 U.S. 414, 423–24, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

Finally, to the extent that Oglala raises other arguments[3] on various theories of entitlement to the 8.26% of indirect costs that it failed to receive in 1995, we find them unpersuasive.

## CONCLUSION

For the above reasons, we reverse the IBCA's award of summary judgment that Oglala is entitled to the full amount of its indirect costs for its 1995 fiscal year ISDA contracts and remand the case for further proceedings consistent with this opinion.

## COSTS

Parties shall bear their own costs.

*REVERSED & REMANDED.*

GAJARSA, Circuit Judge, additional views.

I write separately not in dissent from the final decision, because I cannot find fault with my colleagues' reasoning; rather, I write to express my concern at the

---

**2.** The ultimate outcome in *Ramah I* turned on the validity of the Secretary's 1995 allocation plan for the limited amount of indirect cost money available.

**3.** During oral argument, the Government clarified that whether the Government's fidu-

ciary duty to the tribe had been breached by Interior's less-than-full funding of Oglala's indirect costs for fiscal year 1995 was outside the scope of this appeal. Therefore, we need not address this issue.

manner in which Native American programs once established are funded.

From the original formation of the United States, the relationship between the Native American tribes and the central government has been one of dependency, and, in many instances, the tribes were considered wards of the state. As their relationship developed over the course of time, it was recognized as a legal trust, but it still remained a dependent system which failed to create an environment within which the tribes could pursue objectives that they themselves determined to be of paramount importance. This failure allowed the federal government to maintain the symbiotic relationship with the tribes. It was with this historic perspective that some tribal leaders sought to obtain the right to determine their own destiny and to become truly self-governing. This perspective was the impetus for a self-determination policy.

The original self-determination policy allowing Native American tribes to assume the responsibility of managing the federal programs designed for their benefit by the Bureau of Indian Affairs ("BIA"), was proposed by the Commissioner of Indian Affairs, the Hon. Louis R. Bruce, in 1970. His proposal required the entire bureaucracy to undertake a paradigm shift in the method by which the federal service programs were delivered to the Native American tribes. This shift was crucial to the realization of the self-government of the tribes. The management of the various programs by the beneficiaries was a basic but pragmatic change in the then existing relationship between the United States and Native American tribes. The complacency and patronizing manner with which the federal bureaucracy had rendered services to the Native Americans was troubling not only to Commissioner Bruce, who was only the second Native American to be appointed to that position, but also to then

President Nixon. The President had taken a special interest in Native American issues and raised them to a major priority during his administration.

The underlying, primary objective of the self-determination policy was to provide Native American tribes with the opportunities to develop leadership skills crucial to the effectiveness of self-government. To affect this objective, the federal government granted the Native American tribal governments decision making authority for the federal programs serving their reservations.[1] This objective was to be accomplished within the parameters of the legal trust relationship existing between the tribes and the federal government. It is this trust relationship that establishes the legal obligation between the Native American communities and the federal government. This legal obligation, pursuant to numerous treaties and judicial opinions, has been recognized from the incipient stages of the federal government to the present day. *See United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *United States v. Shoshone Tribe,* 304 U.S. 111, 117–18, 58 S.Ct. 794, 82 L.Ed. 1213 (1938); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). This trust relationship, however, does not exist exclusively and solely between the tribes and the Executive branch. It also extends to the Legislative branch.

The statutory structure for the self-determination policy did not come into being until Pub.L. No. 93–638 was enacted by the Congress in 1975. The statute was known as the Indian Self–Determination and Education Assistance Act, Pub.L. No. 93–638, 88 Stat. 2203 (codified as amended at 25 USC § 450, *et. seq.*) ("ISDA"). Initially, the structure did not allow for specific administrative support costs, the indi-

---

1. Ironically, the first tribe to negotiate an agreement to take over the BIA services in 1970, which served as a precursor for the later enactment of the Indian Self–Determination Act, was the Miccosukee tribe, one of the parties to these appeals.

rect[1] or support costs were taken directly from the program funding. It was finally understood that taking these costs from the program funding shortchanged the programs and limited the extent of the coverage available from the programs. The Congress subsequently authorized the Secretary of the Interior ("Secretary") to negotiate annually the "Indirect Cost Agreement" with the tribal representative.

Under the program, the Office of Inspector General ("OIG"), by delegation from the Secretary, negotiates with the tribes the Indirect Cost Agreement, which sets forth the indirect cost rate incorporated into the ISDA contracts. The Department of Interior then uses the indirect cost rate to determine the amount of contract support cost funding payable to the tribal contractor under the statute. The Indirect Cost Agreement negotiations usually take place prior to the start of the fiscal year or prior to the Congress' budget appropriation. The OIG and the tribes negotiate in good faith that program funds will be appropriated and that indirect costs will be adequately funded. Indeed, the Congress has recognized that "[f]ull funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self–Determination is to succeed." S.Rep. No. 100–274, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2620, at 2632.

The Congress established the Indirect Cost Agreements because it was cognizant that the success of the self-determination program hinged upon the infusion of indirect costs to support the administrative overhead burden that was to be carried out by the tribal contractor. Knowing that it had shifted the burden of providing the program services to the tribal members from the BIA to the tribal governments, the Congress appropriated the necessary funds required to manage such programs. For many years the Congress, by its continued support, recognized and carried forth its trust obligation under the ISDA. Through these programs, the tribes have improved the quality of life for their members. The self-determination policy has been woven into the fabric of the overarching trust relationship, in which the Congress and the Secretary jointly execute the responsibilities of their trust. The 1994 Appropriations Act, however, raises the unpleasant specter that the Congress, now wishing to limit the obligation that is clearly stated in the preamble of the statute, 25 U.S.C. § 450, intended to avoid, and in effect eliminate, its trust obligation by the "notwithstanding" clause, 25 U.S.C. § 450j-1(b), thereby vitiating the entire program.

The critical thread of this country's social fabric is the belief that laws exist to protect our institutions and to enforce obligations undertaken by various agreements. *See e.g., Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). Our democratic government is based upon the premise that we are a country of laws that are fair, just, and equally applied for the protection of all its citizens. The saliency of any Congressional action derives from the government's duty to fulfill its legal obligations. Americans take great pride in the fact that when our government makes a promise, it keeps that promise or suffers the consequences of its breach. *See United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Sadly, in the present case, we are confronted with promises made and promises broken.

Although we as a court do not legislate but only interpret the laws that are enacted by the legislature, we cannot, and should not, stand by idle without calling attention to the travesty that has been perpetrated in these cases. As we have stated in our opinion, when the statutory language is unambiguous, the judicial inquiry is complete and the sole function of the court is to enforce the statute according to its terms. However, what course should a court take when, as here, the statutory language is clear but the legislative intent is equally clear yet would im-

pose a different outcome? While a court must consider the statutory language to ascertain if it "has a plain and unambiguous meaning with regard to the particular dispute in the case," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997), might it also seek to determine whether that language is in conflict with the clear statutory scheme that the Congress designed to satisfy its trust responsibilities? Should not the Congress resolve this conflict?

Here, the government does not expressly argue that the 1994 Appropriations Act repealed the provisions of the ISDA authorizing the indirect support contracts that the tribal organization and the OIG negotiated. The effect of the 1994 Appropriations Act, however, is to leave the Native American tribes without recourse to recover the expenses that they had already incurred by performing BIA functions in reliance on the OIG negotiations. If the Congress continues the appropriation reductions, similar to the 1994 Appropriations Act, giving effect to the "notwithstanding" language would not only amend but effectively repeal the authorizing statute.

The federal government cannot obviate its legal trust obligations by subsequent statutory amendments when others have acted in reliance on the government's initial position. The federal government should be bound by an agreement independent of the form of, or the parties to, that agreement. In *Winstar v. United States*, 64 F.3d 1531 (Fed.Cir.1995), this Court stated that the terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation, absent a specific contractual provisions providing for such a change. This position was affirmed in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), in which the Supreme Court reasoned that the notion that the federal government could avoid a contractual obligation through subsequent legislation would conflict with the government's "own long-run interest as a reliable contracting partner in the myriad of workaday transactions of its agencies." *Id.* at 883, 116 S.Ct. 2432.

Moreover, in the specific context of the Native American and federal government relations, the Supreme Court has explicitly recognized that

> In carrying out its treaty obligations with Indian Tribes the Government is something more than a mere contracting party. Under a humane and self-imposed policy which is found expressly in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards.

*Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) (footnotes omitted). This principle applies with equal force to legislative actions. Having exacted this fiduciary responsibility, the *Seminole Nation* decision supports the proposition that any Congressional limitation on trust obligations owing to Native American tribes must be clearly expressed and specifically supported by the surrounding circumstances and legislative history. In the present case, we not only have the Congress' clear intent established as a matter of policy, but we also have the requirement that tribes enter into agreements on the good faith that the Congress will fulfill its legal obligation.

If the federal government is to carry out its trust responsibility, it is incumbent upon the Secretary to seek and request the necessary funds in the appropriation process and for the Congress to appropriate those funds. Failure to do so by the Secretary and the Congress, in and of itself, may be considered a breach of the federal government's fiduciary obligation to carry out its trust responsibility.

The federal government, in this instance, relies on *Republic Airlines, Inc. v. United States Dept. of Transp.,* 849 F.2d 1315, 1320 (10th Cir.1988), for the proposition that the Congress can in fact amend a substantive underlying statute through an appropriations act. The government's reliance on that particular decision, however, is misplaced because that case is distinguishable from *New York Airways, Inc. v. United States,* 177 Ct.Cl. 800, 369 F.2d 743 (1966). In *Republic Airlines,* there was clear congressional intent to eliminate the substantive programs, *see* 849 F.2d at 1318–22, while in *New York Airways* the court specifically provided that in order for an appropriations act to modify an underlying statute, the appropriations act must clearly manifest the congressional intent to do so, *see* 369 F.2d at 749–51. In the present case, the 1994 Appropriations Act did not mention the authorizing statute (the ISDA), and the relevant legislative history left no doubt that the Congress knew it was not affirmatively altering the obligations under the authorizing statute and did not intend to do so. The Congress, by inserting limiting language in the same subsection that contains a clear mandate to fund the indirect cost agreements, cannot by such dialectic antagonism effectively curtail the substantive program by failing to enact the necessary appropriations that are required to carry out the programs. The government clearly and fundamentally is in error when it ignores the statutory mandates of the substantive enacted legislation creating the program upon which the annual appropriation is based and which governs the use of funds in the absence of later amendatory statutory language.

Notwithstanding our statutory interpretation, other Native American tribes might consider seeking alternative remedies, perhaps premised on the *Winstar* doctrine, for their incurred indirect costs, if in fact not funded, through an action before the Court of Federal Claims.