# United States Court of Appeals for the Federal Circuit

---

**ARCTIC SLOPE NATIVE ASSOCIATION, LTD.,**
*Appellant,*

**v.**

**KATHLEEN SEBELIUS, SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Appellee.*

---

2010-1013

---

Appeal from the Civilian Board of Contract Appeals in case nos. 294-ISDA, 295-ISDA, 296-ISDA, and 297-ISDA, Administrative Judges Candida S. Steel and Jeri Kaylene Somers.

---

Decided: December 15, 2010

---

LLOYD B. MILLER, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, of Washington, DC, argued for appellant. With him on the brief were DONALD J. SIMON, ARTHUR LAZARUS, JR., and PENG YU. Of counsel on the brief were CARTER G. PHILLIPS and JONATHAN F. COHN, Sidley Austin LLP, of Washington, DC.

JACOB A. SCHUNK, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of

Justice, of Washington, DC, argued for appellee. On the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, DONALD E. KINNER, Assistant Director, and SAMEER YERAWADEKAS, Attorney. Of counsel on the brief was SEAN DOOLEY, Senior Attorney, Office of the General Counsel, Public Health Division, United States Department of Health and Human Services, of Washington, DC.

---

Before LOURIE, BRYSON, and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

Arctic Slope Native Association ("ASNA") filed suit against the Secretary of Health and Human Services ("Secretary") for breach of contract, alleging that the government failed to pay ASNA's so-called contract support costs shortfall for fiscal years 1999 and 2000. The Secretary argued that the obligation to pay, under the contract and the statute, was subject to the availability of appropriations and that there were no available appropriations because Congress had provided that the appropriations available for the funding of contract support costs were "not to exceed" specified amounts. The Civilian Board of Contract Appeals ("the Board") granted summary judgment for the Secretary. *Arctic Slope Native Ass'n, Ltd. v. Dep't of Health & Human Servs.*, CBCA 294-ISDA, et al., 09-2 BCA ¶ 34,281 (C.B.C.A. Oct. 1, 2009). We affirm.

BACKGROUND

I

This case is the latest in a long-running dispute between the various Indian tribes and the Secretary concerning the Secretary's obligation to pay contract support

costs. This dispute has led to decisions by the Supreme Court and this court. *See, e.g.*, *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 549 (2005) [hereinafter *Cherokee II*], *aff'g sub nom*, *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075 (Fed. Cir. 2003) [hereinafter *Cherokee I*]; *Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't*, 194 F.3d 1374 (Fed. Cir. 1999), *cert. denied*, 530 U.S. 1203 (2000).

Briefly, the Indian Self-Determination Act ("ISDA"), Pub. L. No. 103-413, 108 Stat. 4250 (codified at 25 U.S.C. §§450–450n), as amended in 1994, authorizes the Secretary to enter into contracts with tribes, under which the tribes supply health services that a government agency would otherwise provide, *id.* § 450f(a)(1). This case concerns indirect costs under the contracts for fiscal years 1999 and 2000. Indirect costs are "administrative or other expense[s] related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program . . . ." *Id.* § 450j-1(a)(3)(A)(ii). The Act and the contract entered into pursuant to the Act require that the Secretary pay the tribal contractors' indirect costs. *Id.* § 450j-1(a). These indirect costs include the secretarial amount, *id.* § 450j-1(a)(1), and contract support costs, *id.* § 450j-1(a)(2). *See also Cherokee II*, 534 U.S. at 634–35. The secretarial amount is the amount the Secretary would have expended had the government itself run the program. The secretarial amount does not include the additional indirect costs that the tribes incur in their operation of the programs, which the Secretary would not have directly incurred (i.e., the cost of administrative resources that the Secretary could draw from other government agencies). These additional indirect costs, which are not included in the secretarial amount, are referred to as contract support costs. *See* 25 U.S.C. § 450j-1(a)(2); *Cherokee II*, 534 U.S. at 635.

Both under the ISDA and the contracts, the government's obligation to pay contract support costs is "subject to the availability of appropriations." 25 U.S.C. § 450j-1(b); Joint App. 133 (incorporating § 450j-1(b) into the contract). Additionally, "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization . . . ." 25 U.S.C. § 450j-1(b). Congress has been reluctant to appropriate the amount necessary to pay the full amount of contract support costs, and the Secretary has accordingly declined to pay contract support costs not funded by appropriations. The Secretary has urged that the "availability of appropriations" clause justified the failure to pay.

A similar dispute arose previously for fiscal years 1994 through 1997. *See Cherokee II*, 543 U.S. at 634–35; *Cherokee I*, 334 F.3d at 1079. The Secretary did not deny the promise to pay, nor the failure to pay, but argued that the legal obligation to pay arose "if, and only if, Congress appropriated sufficient funds, and that, in this instance, Congress failed to do so." *Cherokee II*, 543 U.S. at 636. The Secretary admitted that the relevant appropriations acts did not include an explicit cap on appropriations, but nonetheless argued that "specific recommendations of funding amounts for contract support costs in the appropriations committee reports" were sufficient to impose a cap. *Cherokee I*, 334 F.3d at 1083. Both the Supreme Court and this court rejected the argument that committee report language is sufficient to impose a cap, holding specifically that "restrictive language contained in Committee Reports is not legally binding." *Cherokee II*, 543 U.S. at 646; *see Cherokee I*, 334 F.3d at 1085. "[I]n order for a statutory cap to be binding on an agency, it must be carried into the legislation itself; such a cap cannot be

imposed by statements in committee reports or other legislative history." *Cherokee I*, 334 F.3d at 1085.

This court held, and the Supreme Court affirmed, that where there are "no statutory caps on available appropriations, the Secretary [is] not excused from meeting his contractual obligations by the availability clause of section 450j-1(b)."[1] *Cherokee I*, 334 F.3d at 1093; *see Cherokee II*, 543 U.S. at 641. "[I]f the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment *even if the agency has allocated the funds to another purpose* or assumes other obligations that exhaust the funds." *Cherokee II*, 543 U.S. at 641. Absent explicit restriction, an agency is generally permitted to reprogram funds within a lump-sum appropriation. U.S. Gov't Accountability Office, Principles of Federal Appropriations Law 2-25 (3d ed. 2006) [hereinafter GAO Redbook]. Thus, where there is no "statutory cap or other explicit statutory restriction," the Secretary is required to reprogram funds if doing so is necessary to fund the contract. *Cherokee I*, 334 F.3d at 1086.

The Secretary further argued that under § 450j-1(b) there was no obligation to reprogram funds to pay the claims at issue because "doing so would require a reduction of funds for programs serving other tribes." *Id.* at 1083. This court and the Supreme Court found this

---

[1]     Section 450j-1(b) provides in relevant part that:

Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 U.S.C. § 450j-1(b).

argument unpersuasive because "the relevant congressional appropriations contained *other* unrestricted funds . . . sufficient to pay the claims at issue" that would not require a reduction in funding for programs serving other tribes. *Cherokee II*, 543 U.S. at 641 (emphasis added); *see Cherokee I*, 334 F.3d at 1093.

## II

After the dispute arose with respect to fiscal years 1994 through 1997, Congress acted to impose a statutory cap on funding for contract support costs in fiscal years 1999 and 2000. The appropriations act for fiscal year 1999 provided that "notwithstanding any other provision of law, of the amounts provided herein, *not to exceed* $203,781,000 shall be for payments . . . for contract or grant support costs."[2] Omnibus Consolidated & Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-279 (1998) (emphasis added) [hereinafter 1999 Appropriations Act]. Similarly, the appropriations act for fiscal year 2000 provided that "notwithstanding any other provision of law, of the amounts provided herein, *not to exceed* $228,781,000 shall be for payments . . . for contract or grant support costs." Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-182 (1999) (emphasis added) [hereinafter 2000 Appropriations Act]. The Conference Report viewed this language as imposing a statutory cap, specifically approving our earlier decision in *Oglala Sioux*. H.R. Conf. Rep. No. 106-479, 494–95 (1999). There, as discussed below, we explicitly held that "not to exceed"

---

[2] Congress also imposed a statutory cap phrased in "not to exceed" language for fiscal year 1998, but claims for contract support costs in fiscal year 1998 are not involved in this litigation. *See* Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 105-83, 111 Stat. 1543, 1583 (1997).

language was sufficient to impose a statutory cap. *Oglala Sioux*, 194 F.3d at 1376, 1379–80.

## III

Beginning in fiscal year 1999, ASNA entered into a self-governance contract with the Secretary, which remained in effect during fiscal years 1999 and 2000. The contract does not specify funding amounts for contract support costs, but instead refers to separate Annual Funding Agreements. For each fiscal year, the contract requires the Secretary to pay the full amount of contract support costs specified in the Annual Funding Agreement, "[s]ubject only to the appropriation of funds by [Congress] and to adjustments pursuant to [25 U.S.C. § 450j-1(b)]." Joint App. at 133–34. ASNA does not claim that the Secretary failed to pay the secretarial amount, or the contract support costs specified in the Annual Funding Agreements—approximately $1.29 million for fiscal year 1999[3] and approximately $3 million for fiscal year 2000.[4]

---

[3]    The annual funding agreement for fiscal year 1999 initially identified zero funding for contract support costs, but was later amended to add $297,059 in direct and $902,263 in indirect, non-recurring contract support costs. The agreement was amended again to add $72,662 in direct and $21,697 in indirect, non-recurring contract support costs. *Arctic Slope*, 09-2 BCA ¶ 34,281, slip op. at 4a.

[4]    The annual funding agreement for fiscal year 2000 initially identified $5,254,412 in recurring base funds (including recurring contract support costs) and $902,263 in non-recurring contract support costs. The agreement was amended several times to add additional contract support costs, resulting in a total of $896,483 in direct contract support costs and $2,162,108 in indirect contract support costs. *Arctic Slope*, 09-2 BCA ¶ 34,281, slip op. at 4a–5a.

ASNA claims instead that the Secretary has failed to pay ASNA's contract support cost shortfall—the difference between the amount of support costs specified in the Annual Funding Agreement and ASNA's actual expenditures.

ASNA submitted claims for its contract support cost shortfall—$2,028,723 for fiscal year 1999 and $621,530 for fiscal year 2000. The contracting officer did not issue a decision on these claims. Thus, they were deemed denied under 41 U.S.C. § 605(c)(5). On appeal, the Board concluded that ASNA "is entitled to be paid its full [contract support costs] requirement only as long as appropriations are legally available to do so," and found that "funds were no longer available with which to pay claims" because of the statutory cap imposed by the "not to exceed" language. *Arctic Slope*, 09-2 BCA ¶ 34,281, slip op. at 10a. Accordingly, the Board granted the Secretary's motion for summary judgment. ASNA timely appealed and this court has jurisdiction pursuant to 41 U.S.C. § 607(g)(1)(A) and 28 U.S.C. § 1295(a)(10).

## DISCUSSION

This court reviews the Board's legal determinations *de novo. See Lear v. Siegler Servs., Inc., v. Rumsfeld*, 457 F.3d 1262, 1265–66 (Fed. Cir. 2006). The question of whether the ISDA and the contracts entered into pursuant to that Act require payment of ASNA's contract support costs shortfall is a question of law. *See id.* at 1266.

## I

Like the contract at issue in *Cherokee*, the contract here contains an availability clause (i.e., the contract is subject to the appropriation of funds by Congress). *See Cherokee I*, 334 F.3d at 1082. In stark contrast to *Chero-*

*kee*, however, where the Secretary unsuccessfully relied on committee report language to impose a cap, here there is a statutory cap on funding for contract support costs phrased in traditional not to exceed language. As the Government Accountability Office has noted, the phrase "not to exceed" is a standard phrase used to express Congress's intent to designate a given amount as the maximum available amount for a particular purpose. *See* GAO Redbook 6-32. The opinions of the Government Accountability Office, as expressed in the GAO Redbook, note that "the most effective way to establish a maximum (but not minimum) earmark is by the words 'not to exceed' or 'not more than.'" Additionally, the Comptroller General has recognized that "not to exceed" language "is susceptible of but one meaning"—it restricts agency spending by establishing the maximum amount that an agency may spend. 64 Comp. Gen. 263, 264 (1985). The opinions of the Government Accountability Office and the Comptroller General, while not binding, are "expert opinion[s], which we should prudently consider." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984); *see also Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (relying on GAO Redbook at 6-159).

Our court (explicitly) and the Supreme Court (implicitly) have recognized that "not to exceed" language imposes a binding statutory cap. In *Oglala Sioux*, the appropriations act contained traditional "not to exceed" language. 194 F.3d at 1376. This court explicitly held that "not to exceed" language was sufficient to impose a statutory cap. *Id.* at 1380. The tribe argued that, despite the statutory cap, it was entitled to full funding of its contract support costs. *Id.* at 1378. We rejected that argument, holding that the availability clause in § 450j-1(b) limits the Secretary's ability to bind the government

beyond the statutory cap; thus, the Secretary may not reallocate funding beyond that limit. *Id.* at 1379–80.

Subsequently, in *Cherokee I* we also noted that "Congress generally uses standard phrases to impose a statutory cap," the most common of which is the phrase "not to exceed." 334 F.3d at 1084. We characterized the "not to exceed" language in *Oglala Sioux* as "a statutory cap on appropriations that excused the agency from paying full contract support costs," *id.* at 1083, and concluded that in *Cherokee* there was no statutory cap because "[t]he appropriations acts at issue . . . do not include 'not to exceed language,'" *id.* at 1089. Further, we stated that "if there is a statutory restriction on available appropriations for a program, either in the relevant appropriations act or in a separate statute, the agency is not free to increase funding for that program beyond that limit." *Id.* at 1084. The Supreme Court decision in *Cherokee* did not disagree, assuming that "not to exceed" statutory language was sufficient to impose a statutory cap even though committee reports were not. *See Cherokee II*, 543 U.S. at 642. The Court made clear that reallocation of funds may be prohibited where Congress protects the funds using "statutory earmarks." *Id.* Thus, we conclude that the "not to exceed" language in the appropriations acts for fiscal years 1999 and 2000 imposes a statutory cap on funding for contract support costs, such that the Secretary is not permitted to make payments beyond the maximum specified in the appropriations acts.

## II

ASNA appears not to dispute the fact that the "not to exceed" language imposes a statutory cap. However, ASNA argues that "not to exceed" language, in essence, limits recovery only in cases involving a line-item appro-

priation for a single contract.[5] ASNA contends that the "not to exceed" language imposes no limit on the Secretary's contractual liability in this case because the total appropriation is sufficient to satisfy the obligation to the ASNA, even though insufficient to satisfy the combined obligations to all the tribes. Under ASNA's theory, each tribe could sue separately, and the aggregate recovery would exceed the statutory cap. ASNA contends that the decision of our predecessor court in *Ferris v. United States*, 27 Ct. Cl. 542 (1892), supports its position. It does not.

In *Ferris*, the court held that where the appropriation covers multiple contracts, the contractor may sue for breach if the appropriation is sufficient to cover the contract at issue, even if not sufficient for all purposes. *Id.* at 546. The court stated specifically that "[a] contractor who is one of several persons to be paid out of an appropriation is *not chargeable with knowledge* of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects." *Id.* (emphasis added). Thus, the insufficiency of an appropriation does not "cancel [the government's] obligations, nor defeat the rights of other parties" unless the contractor has notice of a limitation on appropriations. *Id.*

There are important differences between this case and *Ferris*. In *Ferris*, the contractor had no notice of the limited nature of the appropriation, and the court declined to charge "[a] contractor who is one of several

---

[5]    *See Sutton v. United States*, 256 U.S. 575, 581 (1921). In *Sutton*, the Supreme Court held that where the appropriation is for a specific project, the contractor is deemed to have notice of the limitation on appropriations and has no right to recover for work done in excess of the appropriation.

persons to be paid out of an appropriation . . . with knowledge of its administration." 27 Ct. Cl. at 546. The GAO Redbook notes that in situations like *Ferris*, where the contractor is "one party out of several to be paid from a general appropriation," the contractor is not deemed to have notice because "the contractor is under no obligation to know the status or condition of the appropriation account." *GAO Redbook* at 6-44. As we have noted, subsequent to *Ferris*, "subject to the availability of appropriations" language was adopted to change the *Ferris* rule by providing the required notice to the contractor. For example, our predecessor court noted in *C. H. Leavell & Co. v. United States*, 530 F.2d 878, 892 (Ct. Cl. 1976) (citing *Ferris*, 27 Ct. Cl. at 542), that before the incorporation of "subject to the availability of appropriations" language into Army Corps of Engineers contracts, "a failure on the part of Congress for any reason to fund an existing Government contract was held to be a breach of contract." The court further noted that "subject to the availability of appropriations" provisions were included in contracts to overcome the *Ferris* rule by providing notice to the contractor of the limitation on funding. *Id.* at 892. The present contract includes such an availability of funds provision; the contract explicitly states that CSC funding is subject to the availability of appropriations. Joint App. at 133.

ASNA, however, contends that both this court's decision in *Cherokee I* and the Supreme Court's decision in *Cherokee II* hold that the *Ferris* rule applies even where the contract and statute include subject-to-availability language.[6] This is partly correct in that subject-to-

---

[6] ASNA seeks to read *Ferris* more broadly based on the Supreme Court's description of the tribes' argument in *Cherokee*, but the tribes' argument is not adopted by the

availability language does not excuse the failure to pay in the absence of a statutory cap and where the Secretary has the ability to reallocate funds from non-contract uses. *Cherokee II*, 543 U.S. 641; *Cherokee I*, 334 F.3d at 1093– 94. But here there is a statutory cap and no ability to reallocate funds from non-contract uses. In *Ferris* the appropriations act did not contain a statutory cap with respect to the project in question and there was no finding that funds could not be reallocated from discretionary spending to satisfy contractual obligations. *See Ferris*, 27 Ct. Cl. at 546; An Act Making Appropriations for the Construction, Repair, Preservation, and Completion of Certain Works on Rivers and Harbors, and for Other Purposes, ch. 181, 20 Stat. 363, 364, 370, 372 (1879). But a statutory cap bars such reallocation. Adopting ASNA's approach would effectively defeat the statutory cap be- cause the Secretary would be obligated to pay a total amount of tribal obligations exceeding the cap.[7]

---

Court. *See Cherokee II*, 543 U.S. at 549. There the Court stated:

> The Tribes and their amici add . . . that as long as Congress has appropriated sufficient legally unre- stricted funds to pay the contracts at issue, the Gov- ernment normally cannot back out of a promise to pay on the grounds of "insufficient appropriations," even if the contract uses language such as "subject to the availability of appropriations," and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made. *See Ferris v. United States*, 27 Ct.Cl. 542, 546 (1892).

*Cherokee II*, 543 U.S. at 637.

[7]    *In re Newport News Shipbuilding & Dry Dock Co.*, 55 Comp. Gen. 812 (1976), is not to the contrary. In *Newport News*, the government argued that the total

Moreover, such reallocation from one tribe to another would be particularly inappropriate here in light of the statutory language specifically providing that the Secretary need not reallocate funds from one tribe to another, a provision that did not appear in *Ferris* (where there was no language dealing with reallocation among contracts). *See* 25 U.S.C. § 450j-1(b). Here § 450j-1(b) provides that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization." 25 U.S.C. § 450j-1(b). In *Cherokee*, both the Supreme Court and this court were careful to point out that such reallocation from one tribe to another was not required because there were *other* unrestricted funds available that would not require the Secretary to utilize funds devoted to another tribe. *Cherokee II*, 543 U.S. at 641; *Cherokee I*, 334 F.3d at 1093. This court, for example, declined to decide "how much money was obligated to [funding another tribe] and, therefore, unavailable" because the relevant congressional appropriations contained *other* funds not subject to the restriction of § 450j-1(b) which were sufficient to pay full contract support costs to the tribe. *Cherokee I*, 334 F.3d at 1093. Here there are no such unrestricted funds.

In view of the statutory cap, we hold that the *Ferris* approach is inapplicable. The availability of funds provi-

---

appropriation was not available for the contract at issue because language in the committee report divided the total appropriation among several contracts. *Id.* at 818–19. As in *Cherokee*, this argument was rejected. The Comptroller General stated that "subdivisions of an appropriation contained in the agency's budget request or in committee reports are not legally binding . . . unless they are specified in the appropriation act itself." *Id.* at 819–20. Thus, the entire appropriation was available to fund the contract at issue. *Id.* at 822.

sion coupled with the "not to exceed" language limits the Secretary's obligation to the tribes to the appropriated amount. The Secretary is obligated to pay no more than the statute appropriates. *See Oglala Sioux*, 194 F.3d at 1378; *Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1345 (D.C. Cir. 1996). Here the appropriated amount has been paid to the tribes. The method of allocating funds among the various tribes is not at issue.[8]

## III

Alternatively ASNA argues that the Secretary breached the contract by not requesting sufficient appropriations. ASNA asserts that "[t]he law does not permit an agency to enter into contracts limited to available appropriations, secure the benefits of the contractor's services, but fail even *to seek* appropriations sufficient to pay the contracts in full." Appellant's Br. 51. Even if this issue had been properly raised below, which we doubt, it is without merit.

The case on which ASNA relies, *S.A. Healy Co. v. United States*, 576 F.2d 299, 300 (Ct. Cl. 1978), involved a situation in which the "plaintiff was awarded a fixed price [construction] contract," which included an availability

---

[8] Even though the Secretary is under no obligation to reallocate funds from one tribe to benefit another, the Secretary may have a duty to allocate funds among the tribes in a rational, non-discriminatory way. *See Winston Bros. Co. v. United States*, 130 F. Supp. 374, 380 (Ct. Cl. 1955) (holding that where the agency "allocates the funds on a rational and non-discriminatory basis and they prove insufficient, the Government is not liable for harm resulting from the shortage"); *but see Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("As long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives . . . the decision to allocate funds is committed to agency discretion by law."). We need not decide that issue in this case.

clause. The plaintiff sought a monetary award for losses incurred due to a shutdown of work allegedly "caused by [the government's] failure to request and secure sufficient funds from Congress." *Id.* However, in holding that the contractor should not bear the risk of loss, the court relied on the fact that "the contractor was not warned of the lack of funding." *Id.* at 306.

In this case, it is not clear that the Secretary failed to request adequate funding. The Secretary requested a given amount for contract support costs in both fiscal year 1999 and fiscal year 2000. *See* President's Budget for Fiscal Year 1999 (1998), Budget App. 403; President's Budget for Fiscal Year 2000 (1999), Budget App. 434. As it turns out, additional funds were required in both years. As required by statute, the Secretary "prepare[d] and submit[ted] to Congress an annual report . . . includ[ing] . . . an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted."[9]  25 U.S.C. § 450j-1(c). Despite notice of the shortfall, Congress chose to impose a statutory cap on funding for contract support costs. *See* 1999 Appropriations Act, 112 Stat. 2681, 2681-279; 2000 Appropriations Act, 113 Stat. 1501, 1501A-182 (1999). In fact, the committee report for the original version of the 2000 Appropriations Act specifically acknowledged that because "contract support costs . . . have outpaced available funding . . . [w]e have reached a point at which we can no longer offset

---

[9]    *See* Office of Tribal Programs, Indian Health Service Contract Support Cost Data, at 5 (Aug. 27, 1999), *available at* http://www.ncai.org/fileadmin/contract_support/IHS_Contract_Support_Data_FY1999.pdf; Office of Tribal Programs, Indian Health Service Contract Support Costs Shortfall Report, at 1, *available at* http://www.ncai.org/fileadmin/contract_support/FY2000_CSC_Shortfall_Report.pdf.

these costs . . . by continuing to downsize the Federal bureaucracy in IHS." H.R. Rep. No. 106-222, 112–13 (1999).[10] The committee report further stated that Congress "cannot afford to appropriate 100% of contract support costs at the expense of basic program funding for tribes." *Id.*

But whether or not the Secretary could take further action to request additional funding, the contractor was expressly warned of the risk that funding would be inadequate. The contract explicitly specified that funding may be inadequate to fully fund the Secretary's obligations. *See* Joint App. at 150–51. Under such circumstances there can be no breach resulting from an alleged failure to request adequate funding.

Accordingly, we conclude that ASNA is not entitled to payment of its shortfall for fiscal years 1999 and 2000.[11]

---

[10] Appropriations for Indian Health Services for fiscal year 2000 were initially proposed in H.R. 2466, 106th Cong. (1st Sess. 1999). The original bill provided that "notwithstanding any other provision of law, of the amounts provided herein, *not to exceed* $238,781,000 shall be for payments to tribes and tribal organizations for contract or grant support costs for fiscal year 2000." H.R. 2466 (emphasis added). The final bill, as enacted, reduced the amount appropriated for contract support costs by approximately $10 million, but the provisions relating to contract support costs remained virtually unchanged in all other respects. *See* 2000 Appropriations Act, 113 Stat. 1501, 1501A-182.

[11] Before the Board, ASNA argued that unexpended funds for each of the two years in question were available, and that these amounts were later returned to the Treasury. The amounts were $179,539 for fiscal year 1999 and $137,013.51 for fiscal year 2000. The Board held that these amounts were not available because they were returned to the Treasury. That holding appears to conflict with our holding in *Cherokee I* that the proper ques-

**AFFIRMED**

---

tion is "whether funds *were* available for the Secretary to meet his contract obligations, not whether those funds *remain available* now." 334 F.3d at 1092. However, while mentioned in the Statement of the Case of ASNA's opening briefs, the availability of the lapsed funds was not argued and thus not properly raised. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990).