CHEROKEE NATION OF OKLA-HOMA; and Shoshone–Paiute Tribes of the Duck Valley Reservation, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

UNITED STATES of America, Donna E. Shalala, Secretary of the United States Department of Health and Human Services, and Michael H. Trujillo, Director of the Indian Health Service, United States Department of Health and Human Services, Defendants.

No. 99CV92.

United States District Court,
E.D. Oklahoma.

June 25, 2001.

Weldon W. Stout, Jr., Bart Fite, Muskogee, OK, Lloyd Benton Miller, Devin R. Odell, Anchorage, AK, William R. Perry, Anne D. Noto, James E. Glaze, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for Plaintiffs.

Bruce Green, Linda A. Epperley, U.S. Atty., Muskogee, OK, Lisa Olson, Sheila M. Lieber, David W. Ogden, Civil Div., Washington, DC, for Defendants.

## ORDER

SEAY, District Judge.

Before the court for its consideration is the plaintiffs Cherokee Nation and the Shoshone–Paiute Tribes' motion for partial summary judgment of liability on the first and second causes of action and the plaintiffs' motion for declaratory judgment on the third cause of action. Also at issue is the defendants' cross motion for summary judgment.

### I Facts

■ The court finds the facts as follows. The Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 et. seq. (hereinafter the "ISDA") was designed to promote tribal autonomy and self-governance. In the ISDA, Congress allowed tribes to assume direct operation of federal programs administered to tribes that formerly had been controlled by the Indian Health Services (hereinafter "IHS"). The ISDA directs the Secretary of the Interior:

... upon the request of any Indian tribe ..., to enter into a self-determination contract .... with a tribal organization to plan, conduct, and administer programs or portions thereof .... [that are provided] for the benefit of Indians because of their status as Indians. 25 U.S.C. § 450f(a)(1).

■ If the tribe elects to assume operation of programs, the tribe enters into a Self–Determination Contract or a Self–Governance Compact.[1] If a tribe enters into one of these agreements with the government, the only role of the IHS is to monitor the operations of the tribes. The ISDA was designed to assure that funding for services provided to tribes would not be decreased solely because a tribe had assumed operation of the program in question. The ISDA requires that funding under the contract "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs ..." (25 U.S.C. § 450j–1(a)(1)). This amount, known as the "secretarial amount", is the "amount of funding that would have been appropriated for the federal government to operate the programs if they had not been turned over to the Tribe." Ramah Navajo School Board, Inc. v. Babbitt, 87 F.3d 1338, 1341 (D.C.Cir.1996).

In addition to the secretarial amount, the tribes are also paid contract support costs. However, in the beginning these payments were inadequate to meet the needs of the tribal contractors. In 1988, Congress responded by amending the ISDA to make payment of contract support costs mandatory. (Senate Report 103–374, dated September 26, 1994, presented by Senator Inouye from the Committee on Indian Affairs, attached to Plaintiffs' Motions for Summary Judgment as Exhibit "3" and Report to Congressional Committees, entitled "Shortfalls in Indian Contract Support Costs Need to be Addressed," dated June 1999 and prepared by the Governmental Accounting Office, attached to Plaintiffs' Motions for Summary Judgment as Exhibit "2"). The ISDA specifically enumerates which items can be characterized as contract support costs. The ISDA states contract support costs include all "reasonable costs for activities which must be carried on by a tribal organization as a contractor to en-

---

1. In the case at bar, both plaintiffs are parties to a compact. Since Self–Governance Compacts and Self–Determination Contracts are both subject to the same Congressional appropriations mechanism, the terms will be used interchangeably. 25 U.S.C. § 450j–1(b).

sure compliance with the terms of the contract and prudent management," and which are not already included in the secretarial amount specified in 25 U.S.C. § 450j–1(a)(2). (25 U.S.C. § 450j–1(a)(2)). Contract support costs fall into two categories: direct and indirect. The ISDA defines the term indirect contract support cost as those "costs incurred for a common or joint purpose benefiting more than one contract objective or which are not readily assignable to the contract objectives specifically benefited without effort disproportionate to the results achieved;" 25 U.S.C. § 450b(f). Direct contract support costs are all those allowable costs that strictly benefit the IHS programs only and that are not otherwise included in either the indirect costs or in the secretarial amount. 25 U.S.C. § 450b(f). On an annual basis, the IHS calculates the "full" contract support cost needs of each tribal contractor using a variety of information. (Department of Health and Human Services Indian Self–Determination Memorandum No. 92–2 entitled "Contract Support Cost Policy" at 5–9 attached to Plaintiffs' Motions for Summary Judgment as Exhibit "4"). The IHS issues a shortfall report which reflects the deficiency in contract support costs. In this shortfall report, the IHS summarizes each tribes "full" contract support cost needs from the prior year, how much IHS paid against the need, and the resulting shortfall, if any. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

IHS finances Self–Determination Contracts and Compacts under the ISDA, as well as all of its direct health service programs, through funds derived from an annual lump-sum appropriation from Congress designated for "Indian Health Services." IHS' total appropriations from Congress in fiscal years 1996 and 1997 was $1,747,842,000 and $1,806,269,000 re-spectively. (Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, 110 Stat. 3009, 3009–212 (1997) attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "C", Omnibus Consolidated Appropriations Act, 1996, Pub.L. No. 104–134, 110 Stat. 1321, 1321–189 (1996) attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "B" and Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E"). Most of IHS' annual appropriations are distributed to area offices for the payment of recurring costs. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E"). Recurring costs occur automatically from year to year and must be funded without reduction. In fiscal years 1996 and 1997 respectively, IHS allocated $1,313,990,083 and $1,368,893,059 in recurring costs to area offices. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

The remainder of the total annual lump-sum appropriated to IHS is retained each year by headquarters for activities that it manages. All of the money reserved for fiscal years 1996 and 1997 was spent, leaving a zero balance at the end of those fiscal years. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

For fiscal years 1996 and 1997, Congress earmarked in appropriation committee reports, $153,040,000 in 1996 and $160,660,000 in 1997, to be spent on existing contract support costs. These contract support funds were allocated to the area offices for tribal Contracts and Compacts for fiscal years 1996 and 1997. Any diversion of funds for additional contract support costs would have required the IHS to use money otherwise dedicated for other purposes. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E"). To fully pay the contract support costs as requested by plaintiffs would cause a reduction in funding which could severely cripple or even eradicate many health programs serving other tribes or individual Indians. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

The defendants allege that they failed to pay the plaintiffs the full amount of contract support costs they were requesting because plaintiffs were not the proper recipients based on the queue list system. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E"). The funds allocated to the IHS for the execution of self-determination contracts were consistently insufficient to meet the obligation. The queue list system was developed to address the shortfall IHS was encountering with payment of contract support costs. IHS determined that it would place all requests on a queue list or priority list, based on the date of receipt of the request. Approved requests for contract support costs would be 100% funded on a first-come, first-serve basis. Once these funds were exhausted, tribes awaiting new contract support cost funding would be provided new funds in the order they made their request when additional appropriations were available. In the year a tribe reached the top of the queue, it would be paid its new contract support costs for that year and would continue to be paid at least that amount of contract support costs for the newly funded program every year thereafter. This procedure has been used since 1992 for self-determination contracts and was subsequently applied to self-governance compacts. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

In 1998, Congress passed the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 314, 112 Stat. 2681, 2681–288 (1998). This section imposes a cap on IHS payments each year to tribes for contract support costs for new and expanded programs from 1994 through 1998. Congress earmarked $7.5 million to be taken from the lump-sum appropriation for contract support costs for each year from 1994 through 1997, to pay tribes for new contract support costs resulting from new or expanded programs. (Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–2084, 110 Stat. 3009 at 3009–213 (1997) and Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321 at 1321–189 (1996)). In 1996 and 1997, the IHS had already spent its $7.5 million allotment on tribes which were ahead of the Shoshone–Paiute Tribes on the queue list. In 1997, the Cherokee Nation did not receive any additional funding for contract support costs because IHS had already spent its $7.5 million allotment on tribes which were ahead of the Cherokee Nation on the queue list. (Declaration of Carl L. Fitzpatrick attached to Defendants' Motion

for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment as Exhibit "E").

Shoshone–Paiute tribes are federally recognized Indian tribes with an enrolled population of approximately 1,800 members, most of whom live on or near the Duck Valley Reservation, in the desert of northern Nevada and southern Idaho. The health facilities of the tribes are located in Owyhee, Nevada. In 1976, IHS built a 15 bed Owyhee Community Health Facility which is still in use. (Affidavit of Winona Manning attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "16").

In 1988, IHS announced plans to terminate inpatient care at the Owyhee Community Health Facility. In October 1994, the tribes entered into a Self–Governance Compact with IHS, with a plan to contract for the operation of the community health facility. (Affidavit of Winona Manning attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "16").

Next, the Shoshone–Paiute tribes expanded an existing Self–Determination Contract with IHS by contracting to operate the balance of the IHS community health programs. On January 1, 1995, they shifted these programs over to an Annual Funding Agreement, under their compact, for the remainder of fiscal year 1995. (Affidavit of Winona Manning attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "16").

In fiscal year 1996, the Shoshone–Paiute tribes amended the compact expanding the IHS programs they administered to include community health programs plus all of the available IHS Owyhee Hospital Services. Since fiscal year 1996, they have continued to deliver these services. (Affidavit of Winona Manning attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "16").

In their Compact of Self–Governance dated October 1, 1994, Article II, Section 3 provides: "Funding Amount. Subject only to the appropriation of funds by the Congress of the United States and to adjustments pursuant to § 106(b) of the Indian Self–Determination and Education Assistance Act, as amended, the Secretary shall provide the total amounts specified in the Annual Funding Agreement." (Compact of Self–Governance between the Duck Valley Shoshone–Paiute Tribes and the United States of America, attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "19" at 10). Further, in the Annual Funding Agreement entered into between the Shoshone—Paiute tribes and the government, Section 9–Adjustments provides:

(a) Due to Congressional Actions. The parties to this Agreement recognize the total amount of the funding in this Agreement is subject to adjustment due to Congressional action in appropriations Acts or other laws affecting availability of funds to the Indian Health Service and the Department of Health and Human Services. Upon enactment of any such Act or law, the amount of funding provided to the Tribes in this Agreement shall be adjusted as necessary, after the Tribes have been notified of such pending action and subject to any rights which the Tribes may have under this Agreement, the Compact or the law.

(Annual Funding Agreement between the Duck Valley Shoshone–Paiute Tribes and the Secretary of the Department of Health and Human Services of the United States of America, dated October 1, 1995, attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "23" at 13).

For the year 1996, the Secretary agreed in the Shoshone–Paiute tribes' Amended 1996 Annual Funding Agreement that the

"amounts that are available to the Tribes pursuant to the Compact and Title III" include "approved and agreed recurring direct ($494,517) and non-recurring indirect ($1,173,149) contract support funds . . . associated with both those programs", and $367,400 in "approved and agreed . . . . non-recurring direct start-up or pre-award contract support costs in connection with the [same programs]". (Amendment Number 1 to the Fiscal Year 1996 Annual Funding Agreement for the Shoshone–Paiute Tribes of the Duck Valley Reservation, amended March 6, 1996, dated May 22, 1996 attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "26" at 1).

In fiscal year 1997, the Shoshone–Paiute tribes and IHS agreed simply that "the sum of $1,847,196 in recurring direct and indirect contract support cost funds associated with those programs," and $435,762 in nonrecurring funding, of this specified amount $367,400 represents "one-time start-up or preaward contract support funds". This same document provides in Section 9: "(a) Due to Congressional Actions. The parties to this Agreement recognize that the total amount of the funding in this Agreement is subject to the availability of appropriations." (Annual Funding Agreement, dated October 1, 1996 attached to Plaintiffs' Motions for Summary Judgment as Exhibit "27" at 8–9, 14). Plaintiffs allege defendants failed to fully pay the contract support costs for the years 1996–1997.

The Cherokee Nation is a federally recognized tribe with an enrollment in excess of 200,000 members. Approximately 91,-000 members live within the Cherokee Tribal Jurisdictional Service Area which is a 7,000 square mile region in the northeast corner of Oklahoma. Tribal services are provided throughout the Tribal Jurisdictional Area. The Cherokee Nation has operated various IHS care programs under the authority of the Indian Self–Determi-

nation Act for the benefit of its members and other eligible Indians. In fiscal year 1994, the Cherokee Nation began operating these and other IHS programs pursuant to a Self–Governance Compact and associated Annual Funding Agreements. Under the terms of its compact and its fiscal year 1997 Annual Funding Agreement the Cherokee Nation operated five rural outpatient clinics, providing basic outpatient medical care, dental programs, optometry, radiology, mammography, behavioral health services, medical laboratory services, pharmacy services, community nutrition programs, and a ·public health nursing program. The Cherokee Nation also operated associated programs associated with the IHS Claremore Hospital. (Affidavit of Bill Thorne attached to Plaintiffs' Motions for Summary Judgment as Exhibit "36", Compact of Self–Governance between The United States of America and the Cherokee Nation, at 4, dated June 1993, attached to Plaintiffs' Motions for Summary Judgment as Exhibit "37", Annual Funding Agreement between the Cherokee Nation and the United States of America, dated July 1996, attached to Plaintiffs' Motions for Summary Judgment as Exhibit "39" and Addendum No. 1 to FY 1997 Annual Funding Agreement between the United States of America and the Cherokee Nation, dated 1997, attached to Plaintiffs' Motions for Summary Judgment as Exhibit "40").

In its Self–Governance Compact entered into in 1993, Article IV, Section 3 provides:

"Funding Amount. Subject only to the appropriation of funds by the Congress of the United States, and to adjustments pursuant to section 106(b) Title III of P.L. 93–638, as amended the Secretary shall provide to the Nation the total amount of funds specified in the Annual Funding Agreement incorporated by reference in Article V, Section 1. In accordance with Section 304 Title III of

P.L. 93–638, as amended the use of any and all funds under this Compact shall be subject to specific directives or limitations as may be included in applicable appropriations acts."

(Compact of Self–Governance between The United States of America and the Cherokee Nation, at 4, dated June 1993, attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "37" at 4).

In the Annual Funding Agreement which was incorporated into the Self–Governance Compact Section 10 provides in pertinent part:

The parties agree that adjustments may be appropriate due to unanticipated Congressional action. Upon enactment of relevant Appropriations Acts, the adjustments may be negotiated as necessary; provided, however, the Nation shall be notified and consulted in advance of any proposed adjustments. It is recognized by the parties that circumstances may arise where funding variances or other changes or modifications may be needed and the parties shall negotiate same in good faith. Provided, however, this AFA shall not be modified to decrease or delay any funding except pursuant to mutual agreement of the parties.

(Annual Funding Agreement between the Cherokee Nation and the United States of America at 5, dated July 1996, attached to the Plaintiffs' Motions for Summary Judgment as Exhibit "39" at 5).

In fiscal year 1997, the Cherokee Nation calculated that it was entitled to be paid $4,442,099 in indirect costs associated with carrying out all of its contracted IHS programs. (Affidavit of Bill Thorne attached to Plaintiffs' Motions for Summary Judgment as Exhibit "36"). IHS paid $1,656,151, to the Nation. Further, the IHS never paid the Cherokee Nation any direct contract support costs for several newer programs, although the Nation re-quested—and the local Oklahoma area office approved—specific amounts of direct contract support costs for each of these programs. (Affidavit of Bill Thorne attached to Plaintiffs' Motions for Summary Judgment as Exhibit "36").

On March 5, 1999, the Cherokee Nation of Oklahoma and the Shoshone–Paiute Tribes filed a lawsuit in this court alleging the defendants committed a breach of contract and violated the provisions of the ISDA by failing to pay the proper amount to the tribes for contract support costs. On May 17, 1999, the plaintiffs filed their first amended complaint re-alleging the prior two causes of action and alleging an additional cause of action which states that Section 314 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act for fiscal year 1999, Pub.L. 105–277, does not retroactively extinguish or otherwise bar the claims asserted in their complaint.

Plaintiffs filed motions for summary judgment on their three causes of action and the defendants filed a cross motion for summary judgment on all three causes of action asserted by plaintiffs. Currently pending before the court are the Plaintiffs' Motion for Partial Summary Judgment of Liability on the First and Second Causes of Action, the Plaintiffs' Motion for Declaratory Judgment on the Third Cause of Action and the Defendants' Cross Motion for Summary Judgment. On April 5, 2000, after filing the motions for summary judgment, plaintiffs moved to have the court certify a class. On February 9, 2001, the court denied that motion.

## II. Standard of Review

■ 25 U.S.C. § 450m–1(a) of the ISDA authorizes district courts to exercise jurisdiction over civil actions brought under the ISDA and to order appropriate relief. However, it fails to provide any standard of review. The parties have been

unable to agree on the appropriate standard of review for this court. Plaintiffs argue the appropriate standard of review is *de novo*. They argue that under the ISDA, the Contract Disputes Act, 41 U.S.C. § 601 *et. seq.*, applies to civil actions arising under Self–Determination Contracts and Self–Governance Compacts pursuant to 25 U.S.C. § 450m–1(d) and ISDA Title III, § 303(d), reprinted at 25 U.S.C. § 450f (note). Thus, plaintiffs argue the Contract Disputes Act applies to their claims. Plaintiffs argue the Contract Disputes Act provides that a contractor's appeal from the decision of a contracting officer "shall proceed *de novo*." 41 U.S.C. § 609(a)(3).

Plaintiffs also argue that even if the Contract Disputes Act were not applicable to their lawsuit, the standard of review for this case would still be *de novo* under the ISDA. Plaintiffs argue that Congress intended a *de novo* review when it used the terms "original jurisdiction", "civil action", and "other appropriate relief" including money damages in the ISDA. Plaintiffs also argue the legislative history and canons of statutory construction support this court exercising a *de novo* review over an action brought pursuant to the ISDA.

Defendants argue that since the ISDA does not set forth the standard of review, the Administrative Procedures Act (hereinafter the "APA") will provide the appropriate standard. Under the APA, the court must uphold an agency decision unless plaintiffs can show the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." In support of their argument, defendants present to the court three unreported cases, *Suquamish Tribe v. Ada Deer*, C–96–5468 (RJB) (W.D.Wash., September 2, 1997), *California Rural Indian Health Board, Inc., v. Donna Shalala*, C–96–3526 (DLJ) (N.D.Cal. April 24, 1997) and *Yukon–Kuskokwim Health Corpora-*

*tion v. Shalala*, A–96–155 (JWS) (D .Alaska April 15, 1997). These cases have also considered the appropriate standard of review under the ISDA and have held the APA standard of review controls. Addressing the same arguments which have been advanced here, those courts held the ISDA is ambiguous and resolved the ambiguity by applying the presumption against *de novo* review.

The ISDA states: "The Contract Disputes Act ... shall apply to self-determination contracts ..." 25 U.S.C. § 450m–1(d). The Contract Disputes Act states that a claim brought pursuant to the act should "proceed *de novo*." 41 U.S.C. § 609(3). In their first amended complaint, the plaintiffs allege a cause of action pursuant to the Contract Disputes Act. (See First Amended Complaint May 17, 1999 at paragraph 2, 17 and 34). Defendants argue that even if plaintiffs intended to allege a cause of action under the Contract Disputes Act, they failed to do so.

Defendants contend the Contract Disputes Act only applies to claims for money damages. Defendants argue plaintiffs are not actually seeking money damages resulting from a breach of their contracts, but rather are requesting additional contract support funding to which they are allegedly entitled under their contracts and the ISDA. Defendants contend money damages are given to compensate for a suffered loss. In the case at bar, plaintiffs are seeking a specific remedy. A specific remedy is not a substitute for injuries but is an attempt to give the plaintiffs the very thing to which they are entitled. Defendants argue this case really concerns a question of whether defendants have properly interpreted the ISDA rather than a dispute over how much they owe in alleged damages. While it is not entirely clear what specific money damages plaintiffs are seeking in this action, this court finds this

lawsuit centers around how much the defendants possibly owe in alleged damages to plaintiffs for failure to fulfill the terms of their contracts.[2] Thus, it appears to this court their request can properly be termed as one for money damages. *Bowen v. Massachusetts,* 487 U.S. 879, 895, 900–901, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). As a result, this lawsuit is properly brought under the Contract Disputes Act and the *de novo* standard applies.

Even if the court had found the plaintiffs' case was not properly brought under the Contract Disputes Act, the court would have found the standard of review for an action brought pursuant to the ISDA to be *de novo.*[3] In interpreting a statute, the function of the court is simple. It is to "construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Associations,* 310 U.S. 534, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Id.*

25 U.S.C. § 450m–1(a) provides:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter. In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

█ It is well-settled law that when a statute provides for judicial review but fails to set-forth the standards for that review, the court looks to the APA for guidance. *United States v. Carlo Bianchi & Company,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). The APA standard of review requires a court to determine if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). It also limits review to the administrative record. 5 U.S.C. § 706. However, it has been noted that when Congress intends review to be confined to the administrative record, it so indicates, either expressly or by use of a

---

**2.** The defendants also argue that even if plaintiffs' claims were characterized as one for money damages, the *de novo* standard still would not apply because that standard only applies to suits brought in the Court of Claims. However, 25 U.S.C. § 450m–1(a) provides that the United States district courts and the Court of Claims have concurrent jurisdiction. Thus, absent statutory authority to the contrary, the court would be required to apply a *de novo* standard of review to any claim brought pursuant to the Contract Disputes Act.

**3.** The court considered the three unreported cases cited by defendants in support of their argument that the APA standard of review applies. However, the court found the reasoning and analysis in *Shoshone–Bannock Tribes of Fort Hall v. Shalala,* 988 F.Supp. 1306 (D.Or.1997), more persuasive. Accordingly, this court holds that the appropriate standard of review is *de novo.*

term like "substantial evidence". *Chandler v. Roudebush*, 425 U.S. 840, 862, n. 37, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). It is clear from the plain language of the statute there is no such language indicating that review under the ISDA is limited to the restrictive APA standard. In fact, this court finds the plain language of the statute, along with its legislative history, indicates a *de novo* review of an action brought pursuant to the ISDA was intended by Congress.

Section 450m–1(a) of the ISDA grants district courts "original jurisdiction" over "civil actions" with authorization to award money damages. This court finds the use of these terms taken in combination denote an intention by Congress to grant the right of *de novo* review. As the District Court of Oregon stated, "The phrase 'original jurisdiction' has been distinguished from appellate jurisdiction both by Black's Law Dictionary 991 (5th ed.1990) and by Article III, Section 2, Clause 2 of the United States Constitution." *Shoshone–Bannock Tribes of Fort Hall v. Shalala*, 988 F.Supp. 1306, 1314 (D.Or.1997). It is possible that Congress intended to provide for a *de novo* review when it determined to use the term 'original jurisdiction.' However, very little can be determined by Congress' choice to use the term "original jurisdiction" standing alone. As the court stated in *Shoshone–Bannock*, "…a court with 'original jurisdiction' may exercise essentially appellate powers, as with district court review under the APA, while courts with appellate jurisdiction may conduct *de novo* review as with appellate review of district court's conclusions of law." *Id.*

This court agrees with the District Court of Oregon that the use of the phrase "civil action" in combination with "original jurisdiction" and the power to award money damages in the ISDA supports a *de novo* review. *Shoshone–Bannock of Fort Hall*, 988 F.Supp. at 1315. Congress has previously used the terms "original jurisdiction" or "civil action" when vesting jurisdiction in the district courts in matters that proceed *de novo*. *See* 28 U.S.C. §§ 1331, 1332, 1335, 1337, 1338, 1339, 1340 and 1343. *Shoshone–Bannock of Fort Hall*, 988 F.Supp. at 1314. In *Chandler*, the United States Supreme Court was interpreting the statutory language of Title VII, which allows a federal employee to bring a "civil action" following an agency decision. In evaluating the language of the statute, the United States Supreme Court held that under Title VII federal employees are entitled to the same rights as private-sector employees, namely discovery and *de novo* review of an agency decision. *Chandler*, 425 U.S. at 845, 96 S.Ct. 1949.

This court also finds it instructive that the ISDA allows for money damages whereas the APA does not. 5 U.S.C. § 702. This court believes this again expresses Congress' intention for actions brought under the ISDA to be submitted to a *de novo* review.

The legislative history of the ISDA also indicates that Congress intended a *de novo* review. In the early days of the ISDA the Secretary of the United States Department of Health and Human Services was originally delegated broad general authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purposes of carrying out" the ISDA. 25 U.S.C. § 450k(a).[4] The ISDA took the extraordinary step of requiring the IHS, operated by the Secretary of the Department of Health and Human Services, to turn over the direct operation of its federal programs to any Indian tribe which elects to run those programs for its people. 25 U.S.C. § 450f(a)(1). The ISDA requires

---

4. This language was subsequently stricken in the 1994 amendments.

the defendants to divest themselves of the authority as well as the associated funding to operate their programs. However, the Secretary was apparently reluctant to follow the mandate issued by Congress and the tribes never received the appropriate amount of funding. In 1988 and 1994, viewing their delegation of this broad authority to the IHS as a mistake, Congress enacted sweeping amendments to restrict the authority of the Secretary. These amendments were designed to limit the Secretary's discretion as much as possible. (See Senate Report 103–374, dated September 26, 1994 presented by Senator Inouye from the Committee on Indian Affairs attached to Plaintiffs' Motions for Summary Judgment as Exhibit "2" and 25 U.S.C. § 450k which restricts IHS' discretion over the contracting process.)

Under the ISDA, a tribe has two alternative appeal routes when the Secretary declines a Self–Determination Contract. The tribes have the right to "a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter and the opportunity for appeal on the objections raised." 25 U.S.C. § 450f(b)(3). The appeal may be within the agency or to an administrative law judge. 25 U.S.C. § 450f(e)(2). If the tribe chooses not to take that route, it can file an action in district court. 25 U.S.C. § 450f(b)(3). Obviously, Congress intended to give the tribes the option to bypass the agency review process.

■ In construing a statute, a court must look "to the provisions of the whole law, and its object and policy." *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 445, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). This court finds the policy and objectives to be achieved through the ISDA and any alleged violations by the agency are best redressed by the right to *de novo* review. *Shoshone–Bannock of Fort Hall*, 988 F.Supp. at 1316. The court agrees with the court in *Shoshone–Bannock Tribes of Fort Hall* when it stated:

> "To deny a tribe the same rights with respect to a claim filed in a federal district court than it is entitled to obtain through the administrative process would be a perverse result. A tribe should be entitled to the same full discovery, hearing and *de novo* review when it elects to proceed directly to court as it is entitled to receive if it elects to proceed before the agency or an ALJ."

*Shoshone–Bannock of Fort Hall*, 988 F.Supp. at 1317.

This court agrees that given the history of the ISDA, including Congress' repeated attempts to limit the Secretary's discretion and the provision for a full review at the agency level, that Congress intended more than a cursory review of the administrative record. This court holds that Congress intended a *de novo* review of claims brought under the ISDA.[5]

### III. PLAINTIFFS ARE NOT ENTITLED TO ADDITIONAL CONTRACT SUPPORT COSTS

■ The plaintiffs argue they are entitled to their full contract support costs

---

5. In arriving at this conclusion, the court was mindful of the direction the Tenth Circuit Court of Appeals gave to courts interpreting the ISDA. In interpreting 25 U.S.C. § 450j–1, the Tenth Circuit Court of Appeals stated "the canon of [statutory] construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir.1997). The Tenth Circuit Court of Appeals stated "if the [Act] can reasonably be construed as the Tribes would have it construed, it must be construed that way." *Id.* at 1462, quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 (D.C.Cir.1988).

under their respective contracts because the terms in these documents are legally binding. Plaintiffs also argue the ISDA entitles them to full payment of their contract support costs.[6] Defendants respond that plaintiffs ignore the fact that their Self–Determination Contracts specifically state that those contracts are subject to the "availability of appropriations" even in the absence of the statutory funding cap established by the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 314, 112 Stat. 2681, 2681–288 (1998) (hereinafter "Section 314"). Defendants state that no appropriations were in fact available to satisfy the claims made by plaintiffs for the years 1996 and 1997. Defendants further contend Section 314 definitively prescribes that no further appropriations were available to pay the contract support costs requested by plaintiffs for fiscal years 1996 and 1997 for their new and expanded programs undertaken in those years. Defendants finally argue the IHS could only pay such costs to plaintiffs by deducting funding from programs that serve other tribes. This diversion of funds would be in violation of the responsibility the IHS has to other tribes and in violation of the express provisions of the ISDA.

Both of the contracts at issue contain the following language "Subject only to the appropriations of funds by the Congress of the United States and the adjustments pursuant to § 106(b)." In fact, this language is utilized in all contracts and compacts entered into under the ISDA. Further, the statute itself specifically states the obligations are dependent on funding. 25 U.S.C. § 450j–1(b) provides:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the

Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

This court finds the contracts at issue are conditioned on the IHS having sufficient funding. This court does not agree with the interpretation espoused by plaintiffs that the language in the Self–Determination Contracts which states that contract support costs are "subject to availability of appropriations" limits only the Secretary's ministerial duty to disburse funds but not her ultimate liability for full contract support costs. It has been held that "The language of [25 U.S.C.] § 450j–1(b) is clear and unambiguous; any funds provided under an ISDA contract are 'subject to the availability of appropriations.' ... Other sections of the ISDA indicate congressional intent to make ISDA funding subject to the availability of appropriations." *Babbitt v. Oglala Sioux Tribal Public Safety Department*, 194 F.3d 1374, 1378 (C.A.Fed.1999). To adopt plaintiffs' interpretation would render the phrase "availability of appropriations" meaningless. "The best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous ... we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 98–99, 111 S.Ct. 1138, 113 L.Ed.2d 68, (1991). "When the words of a statute are unambiguous, then, 'judicial inquiry is complete'". *Connecticut National Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117

---

**6.** The parties agree that since the court failed to certify a class in the case at bar, the only years at issue for payment of contract support costs are 1996 and 1997.

L.Ed.2d 391 (1992). In *Oglala,* that court simply concluded the ISDA is clear "if the money is not available, it need not be provided." *Oglala,* 194 F.3d at 1379. This court agrees the statute is unequivocal, if the money is not available, IHS does not have to provide it.

Plaintiffs acknowledge their Self–Determination Contracts do include language that they are subject to "available appropriations". However, plaintiffs argue there were appropriations legally available to pay the contract support costs for the years in question. The court finds this contention without merit. Plaintiffs contend that in 1996 $1.374 billion and in 1997 $1.426 billion was appropriated as a lump-sum to IHS to implement the ISDA and other specified laws. Plaintiffs argue there is nothing in the appropriation acts which limits the use of these funds. Plaintiffs claim that if appropriated funds were legally available to pay the contract support request, the Secretary had no discretion to refuse payment. In support of this argument, the plaintiffs cite *Alamo Navajo School Board, Inc., and Miccosukee Corporation,* IBCA Nos. 3560–3562, 3463–3466, 1997 WL 759441 (Dec. 4, 1997), *rev'd, Babbitt v. Miccosukee Corporation,* 217 F.3d 857 (Fed.Cir.1999), *cert. denied,* 530 U.S. 1203, 120 S.Ct. 2196, 147 L.Ed.2d 233 (2000). In *Alamo,* the court held the availability of appropriations language does not apply where the appropriation is in the form of an unrestricted lump-sum amount that is sufficient to cover mandatory funding and "where the Department's current appropriations Act lacks any statutory earmark affecting the use of funds for such purposes." *Id.* at 20–21. Plaintiffs also cite *Shoshone–Bannock Tribes of Fort Hall* for the proposition that contract support costs must be paid if the agency has received sufficient appropriations to do so.

IHS' total appropriations from Congress for "Indian Health Services" in fiscal years 1996 and 1997 was $1,747,842,000 and $1,806,269,000 respectively. Most of IHS' annual appropriations are distributed to area offices for the payment of recurring costs. Recurring costs occur automatically from year to year and must be funded without reduction. In fiscal years 1996 and 1997, respectively, IHS allocated $1,313,990,083 and $1,368,893,059 in recurring costs to area offices. The remainder of the total annual lump-sum appropriated to IHS is retained each year by headquarters for activities that it manages. All of the money reserved for fiscal years 1996 and 1997 was spent leaving a zero balance at the end of those fiscal years. For fiscal years 1996 and 1997, Congress earmarked in appropriation committee reports, $153,040,000 in 1996 and $160,660,000 in 1997 to be spent on existing contract support costs. These contract support funds were allocated to the area offices for tribal contracts and compacts for fiscal years 1996 and 1997. The court finds the money appropriated to IHS for fiscal years 1996 and 1997 was already committed to pay for funding of recurring costs and other mandatory obligations. Thus, there were simply insufficient appropriations to pay the contract support costs requested by plaintiffs. Further, the IHS could not use any of its annual appropriations to pay plaintiffs' contract support costs without impairing its ability to discharge its responsibilities with respect to other tribes and individual Indians. Such a reduction could severely impair various Indian programs. 25 U.S.C. § 450f, § 306 and 450j–1(b) prohibits the IHS from reducing funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization to fund their self-determination contracts.

Plaintiffs also argue that even if no appropriations were available the government is nonetheless liable to them for contract support costs under the ISDA. In

support of the proposition that the ISDA affirmatively requires the government to enter into contracts for a specified amount of contract support costs and to be held liable for that amount regardless of the appropriations, plaintiffs cite *New York Airways, Inc. v. United States,* 177 Ct.Cl. 800, 369 F.2d 743 (Cl.Ct.1966). This court agrees with the court in *Oglala* that the *New York Airways* case is inapplicable to the case at bar. *Oglala,* 194 F.3d at 1379. In *New York Airways,* the government, as a contracting party, had an unqualified contractual obligation for which it had simply failed to appropriate money and pay. In the instant case, the agency's ability to bind the government contractually was expressly conditioned by statute and contract on the availability of appropriations. Further, the statute at issue in *New York Airways* provided the government should "make payments out of appropriations," unlike the statute in this case which provides the government payments are "subject to the availability of appropriations." Thus, the court finds the holding in *New York Airways* is not dispositive of the issues before this court. This court finds the situation in the instant case distinctly different from the cases cited by plaintiffs on this issue because this case involves a statute which expressly restricts the government's authority to pay contractual obligations in excess of appropriations. Accordingly, the only conclusion this court can reach is that the funding of contract support costs must be subject to the availability of appropriations. The court finds the defendants cannot be liable for contract support costs that go beyond the limits of those funds.

In the years in question, the defendants were allocated $7.5 million for payment of new contract support costs. The court finds the plain language of Section 314 caps the amount the government can spend on new contract support costs to $7.5 million. Section 314 states:

Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103–138, 103–332, 104–134, 104–208 and 105–83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes, except that, for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, self-governance compacts or annual funding agreements.

Due to the repeated insufficiency of appropriations to pay contract support costs, the IHS developed a system for payment of new contract support costs. The queue list was designed to allocate the limited funds on a first-come, first-serve basis. In 1997 the IHS had already spent its $7.5 million allotment on tribes ahead of the Cherokee Nation on the queue list. As a result, the Cherokee Nation did not receive any additional funding for contract support costs for those new programs in fiscal year 1997. As to the Shoshone–Paiute tribes, they too did not receive any additional funding for contract support costs for 1996 or 1997 because IHS had already disbursed its $7.5 million allocation to tribes ahead of this plaintiff on the queue list.

This court finds that to allow the IHS to pay additional contract support costs would violate the appropriations clause because it would require spending money that had not been appropriated by Congress. *Office of Personnel Management v.*

*Richmond,* 496 U.S. 414, 424, 426, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (holding "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress").

Plaintiffs also argue the holding in *Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455 (10th Cir.1997), supports their position that the cap of $7.5 million for contract support costs is not applicable. However, the *Ramah* case is distinguishable because the tribes did not ask for amounts over the amount appropriated. In that case, the tribes were disputing how the Bureau of Indian Affairs apportioned the money it was appropriated. Plaintiffs also argue that Section 314 only applies to unobligated balances for 1996 and 1997. As the court discussed previously it has found that there were no unobligated balances for the years 1996–1997.

Further, plaintiffs argue that since a class has not been certified, this case no longer involves "cap" year circumstances. Plaintiffs contend that Congress only began to implement the cap for contract support costs in 1998. However, this court finds that Section 314 applies to the years 1996 and 1997. Section 314 imposes a $7.5 million cap on IHS' payments each year to tribes for contract support costs for their new and expanded programs from 1994 through 1998. This amount had already been disbursed for the years in question. Section 314 bars further payments for those years since no appropriations were available.

Finally, plaintiffs maintain that even if the appropriations were not available, the defendants would still be liable for the contract support costs under governmental contracting principals. Plaintiffs contend the Self–Determination Contracts require the government to pay the full amount of contract support costs. Plaintiffs argue that since they have a statutory right to contract support costs under their con-

tracts and statutes, Congress cannot by Section 314, or otherwise, destroy that right without breaching the contract. However, the cases which plaintiffs cite in support of this proposition are factually distinguishable from the case at bar. In *United States v. Winstar Corporation,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the United States Supreme Court found the government had, in its contracts, assumed the risk that subsequent changes in the law might prevent it from performing. *Id.* at 907–910, 116 S.Ct. 2432. In the instant case, there is no evidence that the government intended to assume the risk if Congress failed to provide sufficient appropriations. In fact, after a review of the contracts into which plaintiffs entered, it appears as if plaintiffs assumed the risk of a shortfall. The contracts clearly state that the obligations are subject to the availability of appropriations. Plaintiffs also cite *Mobil Oil Exploration and Producing Southeast Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), and *Schism v. United States,* 239 F.3d 1280 (Fed.Cir.2001), for the proposition that the government is liable for a breach of contract. However, this court also finds these cases factually distinguishable. Those cases did not involve a situation like the one in the case at bar where the agency's ability to contractually bind the government was expressly conditioned by a previously enacted statute and by the contract itself on the availability of appropriations.

Accordingly, this court **denies** the plaintiffs' motion for summary judgment on its first and second causes of action as well as their motion for summary judgment for a declaratory action regarding Section 314. Further, the court **grants** the defendants' motion for summary judgment.