F I L E D
United States Court of Appeals
Tenth Circuit

NOV 26 2002

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CHEROKEE NATION OF OKLAHOMA;
SHOSHONE-PAIUTE TRIBES OF THE
DUCK VALLEY RESERVATION,

Plaintiffs - Appellants,

v.

TOMMY G. THOMPSON, Secretary of
Health and Human Services; MICHAEL
H. TRUJILLO, Director of the Indian
Health Service, United States Department
of Health and Human Services,

Defendants - Appellees.

No. 01-7106

---

ALAMO-NAVAJO SCHOOL BOARD;
BRISTOL BAY AREA HEALTH
CORPORATION; LAC COURTES
ORIELLES BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS; RAMAH
NAVAJO CHAPTER; OGLALA SIOUX
TRIBE; RAMAH NAVAJO SCHOOL
BOARD, INC.,

Amici Curiae.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. 99-CV-92-S)

Lloyd Benton Miller (William R. Perry, Melanie B. Osborne with him on the briefs), Sonosky, Chambers, Sachse, Miller & Munson, Anchorage, Alaska, for Plaintiffs - Appellants.

Jeffrica Jenkins Lee, Attorney, Civil Division, United States Department of Justice, Washington, D.C. (Robert D. McCallum, Jr., Assistant Attorney General, Washington, D.C.; Sheldon J. Sperling, United States Attorney, Muskogee, Oklahoma; and Barbara C. Biddle, Attorney, Civil Division, United States Department of Justice, Washington, D.C., with her on the briefs), for Defendants - Appellees.

Marsha Kostura Schmidt, Hobbs, Straus, Dean & Walker, LLP, Washington, D.C., filed an amici brief on behalf of Alamo-Navajo School Board, Bristol Bay Area Health Corporation, and LAC Courtes Orielles Band of Lake Superior Chippewa Indians.

Michael P. Gross, M.P. Gross & Associates, P.C., Santa Fe, New Mexico, and C. Bryant Rogers, Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, LLP, Santa Fe, New Mexico, filed an amici brief on behalf of Ramah Navajo Chapter, Oglala Sioux Tribe, and Ramah Navajo School Board, Inc.

---

Before **MURPHY** , **ANDERSON** , and **BALDOCK** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

This case involves the adequacy of funding provided by the United States to plaintiffs, two Native American Tribes, for their performance of contracts operated under the Indian Self-Determination and Education Assistance Act. The Tribes appeal the grant of summary judgment to the United States. We affirm.

## BACKGROUND

Under the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450-450(n), as amended, the Secretary of Health and Human Services ("Secretary") may enter into contracts or compacts with Indian tribes (self-determination contracts) to permit the tribes to administer various programs that the Secretary would otherwise administer. The Act further stipulates that the Secretary will provide funding for the administration of those programs. The basic idea behind the ISDA is to promote tribal autonomy and self-determination by permitting tribes to operate programs previously operated by the federal government, but to ensure that they do not suffer a reduction in funding for those programs simply because they assume direct operation of them.

The Indian Health Service ("IHS") provides primary health care for Indians and Alaska natives throughout the United States. In fiscal year 1994, in accordance with the ISDA, plaintiffs, the Shoshone-Paiute and the Cherokee Nation Tribes of the Duck Valley Reservation, entered into Compacts of Self-Governance and associated Annual Funding Agreements with the Secretary to operate certain IHS programs for their members.

Under § 450j-1(a) of the ISDA, the Secretary is obligated to provide funding for those self-determination contracts or compacts[1] in an amount equal to what he would have provided were IHS to continue to provide health care services itself directly. This is called the "Secretarial amount." 25 U.S.C. § 450j-1(a)(1). See Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1341 (D.C. Cir. 1996) (describing the Secretarial amount as the "amount of funding that would have been appropriated for the federal government to operate the programs if they had not been turned over to the Tribe").

In addition to the Secretarial amount, the ISDA directs the Secretary to provide contract support costs ("CSC") to cover the direct and indirect expenses associated with operating the programs. The ISDA does not precisely define what CSC are.[2] We have observed that "[r]eviewing . . .the [ISDA] as a whole, . . .

---

[1]There is no material distinction for purposes of this appeal between an agreement called a "compact" and an agreement called a "contract." Accordingly, as the parties have done, we use the terms interchangeably.

[2]The ISDA provides some general guidance as to what CSC are: "the reasonable costs for activities which must be carried on by a tribal organization as a contractor . . . but which—

(A) normally are not carried on by the respective Secretary in his direct operation of the program; or
(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2). It also provides for the payment of CSC for "direct program expenses for the operation of the Federal program that is the subject of

(continued...)

-4-

'contract support costs' encompasses 'indirect costs' incurred by a tribal organization in carrying out a self-determination contract." Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461 (10th Cir. 1997). "Indirect costs" are, in turn, defined as those "incurred for a common or joint purpose benefiting more than one contract objective . . . ," 25 U.S.C. § 450b(f), as contrasted with "direct program costs," which are those "that can be identified specifically with a particular contract objective," 25 U.S.C. § 450b(c). See Shoshone-Bannock Tribes v. Secretary, 279 F.3d 660, 663 n.5 (9th Cir. 2002); Ramah Navajo Chapter, 112 F.3d at 1457-58. As this case demonstrates, the adequacy of the funding provided for tribal indirect costs has proven to be a recurring and troublesome issue. See Ramah Navajo Chapter, 112 F.3d at 1462 ("The legislative history indicates one of the primary concerns of Congress in enacting the [1988] amendments [to the ISDA] was the chronic underfunding of tribal indirect costs.") (citing S. Rep. No. 100-274 at 8-13 (1987)). See United States General Accounting Office, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed at p.3 (June 1999) (noting that while "Tribes' allowable contract support costs have tripled from 1989 through

_____

[2](...continued)
the contract," as well as "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service or activity pursuant to the contract." 25 U.S.C. § 450j-1(a)(3)(A)(i), (ii).

1998—increasing from about $125 million to about $375 million. . . . Congress has not funded contract support to keep pace with these increases, resulting in funding shortfalls").

The ISDA provides a further and, in this case, significant caveat to the funding obligations: "Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter." 25 U.S.C. § 450j-1(b); see also 25 U.S.C. § 450j(c) ("The amounts of [self-determination] contracts shall be subject to the availability of appropriations."). The first clause in § 450j-1(b) is called the "availability clause" and the second the "reduction clause."

Additionally, every self-determination contract entered into under the ISDA must either contain or incorporate by reference the provisions of a model agreement prescribed by the ISDA. 25 U.S.C. § 450 *l*(a). The model agreement reiterates the availability clause, specifically providing that the amount funded by the Secretary is "[s]ubject to the availability of appropriations . . . ." 25 U.S.C. § 450 *l*(c) (describing § 1(b)(4) of model agreement). Accordingly, the compact with the Shoshone-Paiute Tribe contained the following clause:

> Funding Amount. Subject only to the appropriation of funds by the
> Congress of the United States and to adjustments pursuant to [25

U.S.C. § 450j-1] of the Indian Self-Determination and Education Assistance Act, as amended, the Secretary shall provide the total amounts specified in the Annual Funding Agreement.

Appellants' App. at 302. The compact with the Cherokee Nation contained virtually identical language. See id. at 425.

Additionally, the Annual Funding Agreement between the Shoshone-Paiutes and the Secretary included the following provision:

Section 9 – Adjustments.

(a) Due to Congressional Actions. The parties to this Agreement recognize that the total amount of the funding in this Agreement is subject to adjustment due to Congressional action in appropriations Acts or other laws affecting availability of funds to the Indian Health Service and the Department of Health and Human Services. Upon enactment of any such Act or law, the amount of funding provided to the Tribes in this Agreement shall be adjusted as necessary, after the Tribes have been notified of such pending action and subject to any rights which the Tribes may have under this Agreement, the Compact, or the law.

Appellants' App. at 342. The Annual Funding Agreement between the Cherokee Nation and the Secretary stated as follows:

The parties agree that adjustments may be appropriate due to unanticipated Congressional action. Upon enactment of relevant Appropriations Acts, the adjustments may be negotiated as necessary; provided, however, the Nation shall be notified and consulted in advance of any proposed adjustments. It is recognized by the parties that circumstances may arise where funding variances or other changes or modifications may be needed, and the parties shall negotiate same in good faith. Provided, however, this AFA shall not be modified to decrease or delay any funding except pursuant to mutual agreement of the parties.

Appellants' App. at 450.

Recognizing that there could be numerous tribes competing for funding, the ISDA gave the IHS some flexibility in determining how to allocate funds: "[p]ayments of any grants or under any contracts pursuant to section 450f and 450h of this title may be made in advance or by way of reimbursement and in such installments and on such conditions as the appropriate Secretary deems necessary to carry out the purposes of this part." 25 U.S.C. § 450j(b). This case concerns a dispute about the allocation of CSC funds to the plaintiff Tribes for fiscal years 1996 and 1997.

In allocating CSCs for those years, IHS categorized contracts with tribes into two broad groups—"existing" contracts and "new or expanded" contracts.[3] Existing contracts were those that a tribe had been operating in a prior year or years. IHS allocated CSCs to existing contracts generally in accordance with the recommendations contained in appropriation committee reports. New or expanded contracts were those involving programs which tribes had never operated before. With respect to these new or expanded contracts, IHS took the ISD Fund Congress had appropriated for the "transitional costs of initial or

---

[3]IHS' methodology in awarding CSC funds was explained in an internal agency guideline call the Indian Self-Determination Memorandum 92-2. This memorandum was superseded in 1996 by IHS Circular No. 96-04, which contains essentially the same methodology.

expanded tribal contracts" and established a priority list based on the date the tribe requested funding for a new or expanded contract. Each year IHS would fully pay for CSCs for new or expanded contracts at the top of the priority list, and continue down the list until the ISD Fund was fully depleted. Contracts that had been so funded were removed from the list, and those below it advanced. In practice, the funds for new or expanded contracts were depleted before every tribe on the priority list received its CSC funding for new or expanded programs.

At the end of each year, the IHS would summarize the full CSC needs of each contracting tribe, in the prior year, calculate how much the IHS paid toward those CSC needs, and determine the resulting shortfall, if any. The Director of the Division of Financial Management for the IHS stated that in 1997 there was a CSC funding shortfall of $81,996,000 and in 1996 a CSC funding shortfall of $43,000,000. Fitzpatrick Decl. at ¶ 8, Appellants' App. at 530.

As indicated, this case concerns a dispute about the amount of CSCs provided to the plaintiff Tribes in fiscal years 1996 and 1997. [4] For fiscal year 1996, the House Committee on Appropriations recommended that approximately $1.7 billion be appropriated to IHS, with $153 million to be spent on CSCs for existing self-determination contracts, and $7.5 million on such costs for new or

_____

[4]Plaintiffs aver that the Shoshone-Paiute tribe was underfunded in 1996 and 1997, and that the Cherokee Nation tribe was underfunded in 1997.

expanded self-determination contracts.     See H.R. Rep. No. 104-173, at 97 (1995). As actually enacted, the Appropriations Act for 1996 appropriated the recommended $1.7 billion, of which approximately $1.374 billion was unrestricted.  Of that $1.374 billion, however, $7.5 million "shall remain available until expended, for the Indian Self-Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, grants or cooperative agreements with the Indian Health Service under the provisions of the Indian Self-Determination Act."  Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-189 (1996).

For fiscal year 1997, Congress similarly appropriated a lump sum of approximately $1.8 billion to IHS for administration of the ISDA, of which $160,000,000 had been earmarked by the appropriations committee report for CSCs for existing contracts.     See S. Rep. No. 104-319, at 90 (1996).  As with the 1996 appropriation, in the actual Appropriations Act, Congress appropriated the recommended $1.8 billion, with $1.426 billion unrestricted, and, as in 1996, it allocated $7.5 million to the ISD Fund for new or expanded contracts under the ISDA. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009-212, 3009-213 (1996).  Thus, neither Act on its face restricted or limited the amount of funds, out of the lump-sum appropriation, available for

CSCs for ongoing programs.  Both designated $7.5 million to "remain available until expended" in the ISD Fund to pay for CSCs for new or expanded contracts.

In fiscal years 1996 and 1997, the requests for CSCs for new and expanded contracts exceeded the $7.5 million allocated.  As a result, full CSC funding for such new and expanded contracts was delayed and/or not paid at all for some tribes, including the plaintiffs.  Additionally, plaintiffs allege that CSC funding for their ongoing contracts was inadequate.  The Cherokee Nation claims that, in total, it was not paid $3.4 million in CSC for fiscal year 1997.  See First Amended Comp. at ¶¶ 31, 32; Appellants' App. at 44.  The Shoshone-Paiute Tribe claims it was not paid $3.5 million in CSC for fiscal years 1996 and 1997.  See id. at ¶¶ 14, 15; Appellants' App. at 39-40; Fitzpatrick Decl. at 18, Appellants' App. at 534-35.  Both Tribes assert that, because of these budget shortfalls, they were compelled to make substantial cuts in their programs.

On October 21, 1998, Congress passed the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 314, 112 Stat. 2681-288 (1998), which imposed a mandatory cap on the total amount of CSC funding for new and expanded programs.  Section 314 states in part:

> Notwithstanding any other provision of law, amounts appropriated to
> or earmarked in committee reports for the Bureau of Indian Affairs
> and the Indian Health Service by Public Law 103-138, 103-332,
> 104-134, 104-208 and 105-83 for payments to tribes and tribal
> organizations for contract support costs associated with self-
> determination or self-governance contracts, grants, compacts, or

annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes . . . .

The public laws referenced in § 314 included the 1996 and 1997 Appropriations Acts which, as indicated, had appropriated $7.5 million for CSCs for new and expanded programs. Additionally, the committee reports which preceded those laws had earmarked certain amounts for CSCs for ongoing programs. In 1998 Congress also enacted a one-year moratorium barring the Secretary from entering into further ISDA contracts. See id., § 328; see also Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 1001 (10th Cir.), modified on rehearing, 257 F.3d 1158 (2001).

Alleging that the Secretary failed to fully pay all of their CSCs associated with both the ongoing portions of their compacts with the IHS and the initial and expanded portions of their compacts, the plaintiff Tribes brought administrative claims against the Secretary under the Contract Disputes Act, 41 U.S.C. §§ 601-13. When that failed to resolve the dispute, the Tribes filed this action in March 1999, seeking damages and declaratory relief against the United States, the Secretary, and the Director of the IHS. All parties filed motions for summary judgment, and, on June 25, 2001, the district court denied the Tribes' motions, granted the United States' motion for summary judgment and dismissed the case.

Concluding that the language of the ISDA was clear and unambiguous, the district court reasoned as follows:

> This court finds the contracts at issue are conditioned on the IHS having sufficient funding. This court does not agree with the interpretation espoused by plaintiffs that the language in the Self-Determination Contracts which states that contract support costs are "subject to availability of appropriations" limits only the Secretary's ministerial duty to disburse funds but not her ultimate liability for full contract support costs. . . . To adopt plaintiffs' interpretation would render the phrase "availability of appropriations" meaningless.

Cherokee Nation v. United States, 190 F. Supp. 2d 1248, 1259 (E.D. Okla. 2001).

The court further found that:

> the money appropriated to IHS for fiscal years 1996 and 1997 was already committed to pay for funding of recurring costs and other mandatory obligations. Thus, there were simply insufficient appropriations to pay the contract support costs requested by plaintiffs. Further, the IHS could not use any of its annual appropriations to pay plaintiffs' contract supports costs without impairing its ability to discharge its responsibilities with respect to other tribes and individual Indians.

Id. at 1260. The court also held that § 314 limited the funds available for CSCs for new or expanded programs:

> Section 314 imposes a $7.5 million cap on IHS' payments each year to tribes for contract support costs for their new and expanded programs from 1994 through 1998. This amount had already been disbursed for the years in question. Section 314 bars further payments for those years since no appropriations were available.

-13-

Id. at 1262. Finally, the court rejected plaintiffs' argument that, regardless of the level of appropriations, the government was nonetheless liable to them under contract principles for their full CSCs.

Plaintiff Tribes appeal, arguing: (1) sufficient appropriations were legally available such that the Secretary was able to and should have paid plaintiffs' full CSCs for fiscal years 1996 and 1997 and neither the availability-of-appropriations clause nor the reduction clause contained in 25 U.S.C. § 450j-1(b) provide a defense to that obligation; (2) section 314 does not excuse the failure to pay because it would amount to a retroactive extinguishment of vested contractual and statutory rights, thereby, at a minimum, exposing the government to liability in damages; and (3) plaintiffs' contracts under the ISDA obligated the IHS to secure adequate appropriations to satisfy its contractual obligations.

We review the grant of summary judgment *de novo*, applying the same standard as did the district court. Ramah Navajo Chapter, 112 F.3d at 1460. Summary judgment is appropriately granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party." Ramah Navajo Chapter, 112 F.3d at 1460.

**DISCUSSION**

"The starting point in any case involving statutory construction is the language of the statute itself." Id. The government argues that § 450j-1(b) clearly and unambiguously states that the IHS' obligation to provide full funding for ongoing and/or new and expanded CSC for plaintiffs' programs in fiscal years 1996 and 1997 is subject to the availability of appropriations by Congress, and, since there were insufficient appropriations to fully pay those costs, IHS incurs no liability for its failure to so pay. It further argues that three circuit courts have so held, and we should align ourselves with those courts.

We begin, therefore, with the relevant language of the ISDA: "Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe . . . ." 45 U.S.C. § 450j-1(b). As the statute plainly states, the *"provision* of funds" is " *subject to* the availability of appropriations." Id. (emphasis added). This is so "[n]otwithstanding *any other provision* " of the Act. Id. (emphasis added).

This language is "clear and unambiguous." Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't , 194 F.3d 1374, 1378 (Fed. Cir. 1999). By means of this express language, "Congress has plainly excluded the possibility of construing the

contract support costs provision as an entitlement that exists independently of whether Congress appropriates money to cover it." Shoshone-Bannock Tribes, 279 F.3d at 665. We agree with those courts, as well as the District of Columbia Circuit, which also found the statutory language clear and compelling:

> [W]e read the subject-to-availability-of-funds provision to mean precisely what it says: the Secretary need only distribute the amount of money appropriated by Congress under the Act, and need not take money intended to serve non-CSF purposes under the ISDA in order to meet his responsibility to allocate CSF.

Ramah Navajo Sch. Bd., 87 F.3d at 1345. To hold otherwise would "render the subject-to-appropriations language of § 450j-1(b) meaningless." Oglala Sioux Tribal Pub. Safety Dep't, 194 F.3d at 1378.

Plaintiffs respond that appropriations were, in fact, "legally available" to fully pay their CSCs. Thus, they argue that the availability clause does not excuse the government's failure to fully pay their CSCs for their ongoing programs/contracts or their new or expanded ones. Because the arguments are slightly different with respect to CSC funding for ongoing contracts, as contrasted with new or expanded ones, we address each set of contracts in turn.

## I. Ongoing Contract CSCs

Plaintiffs make a series of arguments about why, notwithstanding the availability clause, they were entitled to full funding of CSCs for ongoing

-16-

programs. First, they argue that the appropriations for ongoing CSCs at issue here were legally available because they were part of a lump-sum unrestricted appropriation for IHS, and the fact that the appropriations committee reports recommended that CSCs for ongoing contracts be limited to $153 million in 1976 and $160 million in 1997 is irrelevant in the face of the silence of the Appropriation Acts on the issue. They also argue that CSC payments cannot "take a back-seat to IHS's discretionary decisions about how best to spend its lump-sum appropriations" without violating both the spirit of the ISDA as a whole and the legislative history of the 1988 amendments to the ISDA. Appellants' Op. Br. at 28. Those amendments include § 450j-1(b), which itself reflected "a studied congressional intent to deny the Secretary all discretion over contract funding decisions." Id. Finally, they argue the district court erred in relying on the recommendations of the appropriations committees as providing an "earmark" capping the amount available for ongoing CSCs.

Based on the materials before it at the summary judgment stage, the district court found that "[m]ost of IHS' annual appropriations are distributed to area offices for the payment of recurring costs . . . [which are costs that] occur automatically from year to year and must be funded without reduction." Cherokee Nation, 190 F. Supp. 2d at 1250 (citing the Declaration of Carl Fitzpatrick, the Director of the Division of Financial Management for the IHS). Thus, "[i]n fiscal

-17-

year 1997, IHS allocated to the Area Offices approximately $1,368,893,059 of the total approximately $1.8 billion annual appropriation on a recurring basis . . . ." Fitzpatrick Decl. at ¶ 10, Appellants' App. at 530-31. For fiscal year 1996, the IHS allocated approximately $1,313,990,083 on a recurring basis. Id., Appellants' App. at 531.

Further, in accordance with the appropriation committee report recommendations, the IHS allocated to area offices for tribal contract CSCs $153,040,000 in 1996 and $160,660,000 in 1997. Id. at ¶ 17, Appellants' App. at 534. Fitzpatrick further declared that "reprogramming additional funds for contract support costs would have required IHS to use money otherwise dedicated to other purposes supporting health services delivery to tribes." Id. at ¶ 17, Appellant's App. at 534. Finally, Fitzpatrick stated that all of the money appropriated for fiscal years 1996 and 1997 was in fact spent, leaving a zero balance at the end of the year. [5]

---

[5]Plaintiffs dispute the validity of the assertion that no moneys were left over from the appropriations for IHS in 1996 and 1997. In support of their allegation that there was not a zero balance, however, the Tribes refer us to a document in their appendix titled "Procedures for Allocating Prior Year Unobligated Balances to Satisfy CSC Shortfalls." Appellants' App. at 489. Plaintiffs assert it is dated November 1998, although no date appears on the document. Moreover, it is labeled "DRAFT For Discussion Purposes Only" and, in any event, does not support plaintiffs' assertion that there were, in fact, balances remaining from fiscal years 1996 and 1997. Thus, this document fails to rebut the Fitzpatrick Declaration's statement that there was a zero balance.

While plaintiffs argue that the district court's conclusions on these points are unsupported or somehow erroneous, they do not directly challenge the validity or accuracy of the Fitzpatrick Declaration, nor explain why the district court was not entitled to rely on it in ruling on the motions for summary judgment. The Fitzpatrick Declaration demonstrated that providing to the plaintiff Tribes their entire CSCs for ongoing contracts would have necessitated a reduction in funding for other tribal programs, or a reprogramming of such funds. [6]

Plaintiffs argue that the government is simply making an "after-the-fact" justification for its failure to fully pay CSCs, once it decided to spend all the money appropriated to it on other items. They argue that their contractual and statutory entitlement to such full funding vested immediately, at the beginning of each fiscal year, and, presumably, ahead of other IHS obligations. But, as the government points out, plaintiffs provide no support for that assertion, nor would that make sense, given the structure of the compacts plaintiffs have with the government, as well as the IHS' numerous other mandatory financial obligations. [7]

---

[6]Plaintiffs assert that the government's "'reduction clause' defense is nothing but a *post hoc* rationalization for actions that patently violated the Tribes' rights." Appellants' Op. Br. at 38 n.61. However, as the government points out, the record demonstrates that the IHS made its budgetary allocations for all funds, including CSCs, at the beginning of the year. See Fitzpatrick Decl. ¶ 4 & Ex. F., Appellants' App. at 528, 540-43.

[7]Both the ISDA, which authorizes the contracts at issue, and the contracts themselves, explicitly make the availability of the sums owed to the Tribes

(continued...)

-19-

Moreover, while the Tribes correctly argue that the earmark recommendations of a committee are not typically legally binding,[8] the IHS is likewise not obligated to completely ignore them. Nothing suggests that the IHS awarded the amount it did for ongoing program CSCs because it felt <u>legally</u> obligated to do so because of the committee report recommendations, as opposed to making that allocation as an exercise of the limited discretion inevitably vested in it. See <u>Ramah Navajo Chap.</u>, 112 F.3d at 1463 (noting that 1988 amendments retain for government some discretion in awarding CSCs); <u>Ramah Navajo Sch. Bd., Inc.</u>, 87 F.3d at 1346 n.11 (noting the very limited discretion the Secretary has to award insufficient CSC funds under the ISDA).[9] In sum, we agree with the

_____

[7](...continued)
subject to the availability of appropriations. Thus, it is implicit that, whenever the contracts stated the CSC funds were due, only those funds were due which had sufficient appropriations "backing" them. Further, plaintiffs fail to explain why their claims for CSC funds should take priority over all other tribal claims for funds from IHS.

[8]As we discuss <u>infra</u>, § 314 retroactively gave those committee earmarks binding authority.

[9]Plaintiffs argue that the 1988 amendments to the ISDA reflect a desire to severely limit the Secretary's discretion in allocating CSC funds. We agree. As the D.C. Circuit observed, "Congress left the Secretary with as little discretion as feasible in the allocation of CS[C]." <u>Ramah Navajo Sch. Bd.</u>, 87 F.3d at 1344. However, as the discussion in <u>Ramah Navajo Sch. Bd.</u> indicates, we must bear in mind the context in which CSCs are allocated. Where there are sufficient appropriations to fully fund all CSCs, "the Act informs the Secretary exactly how the full funding should be allocated." <u>Id.</u> at 1348. In the face of an insufficient appropriation, the Secretary must "follow as closely as possible the allocation

(continued...)

-20-

district court that funding for the Tribes' ongoing CSCs was subject to the availability of appropriations from Congress, and there were insufficient appropriations to fully pay those CSCs.

## II. New or Expanded Contracts

As all parties agree, the 1996 and 1997 Appropriations Acts specifically addressed funding for new or expanded tribal contracts: "$7,500,000 shall remain available until expended [for the ISD Fund] . . . for the transitional costs of initial or expanded tribal contracts." 110 Stat. 1321-189, 110 Stat. 3009-212, 213. As all parties also agree, tribes requested far more than the $7.5 million available for new or expanded contracts, and, pursuant to its queue or priority list system, the IHS awarded CSC funds to tribes ahead of plaintiffs on the priority list.

Plaintiffs argue that the "shall remain available" language placed no cap or limit on the amount of CSC funds which could be awarded to tribes for new or expanded programs, so IHS' failure to award more than the $7.5 million violated both the ISDA and plaintiffs' compacts with the government. We disagree.

---

[9](...continued)
plan Congress designed in anticipation of <u>full</u> funding." <u>Id.</u> Thus, where appropriations are insufficient, the Secretary has a very limited discretion to allocate those funds in a manner consistent with the ISDA.

The Ninth Circuit in    Shoshone-Bannock Tribes    considered this very issue.

It concluded as follows:

> The appropriation language is arguably ambiguous.  The language,
> $7.5 million "shall remain available until expended" is not an
> unambiguous cap, as was the "of which not to exceed" language of
> the [1995] appropriation.  By themselves, the words might mean that
> $7.5 million is available, without necessarily implying that other
> money is unavailable.  Alternatively, they could mean that, of the
> total appropriation, only $7.5 million is available for the contract
> support costs.  The House Appropriations Committee provided
> explanatory language in its report on the appropriation.  The
> Committee Report speaks to a concern it had "to contain the cost
> escalation in contract support costs," and says "[t]he Committee has
> provided $7,500,000 for the Indian Self-Determination Fund . . . to
> be used for new and expanded contracts."  This Committee Report
> language lends itself to the second reading, that only $7.5 million is
> available, not the first.  The most natural reading is that the
> Committee gave attention to how much of the total appropriation
> should go to contract support costs for new and expanded contracts
> and decided that $7.5 million was all they wanted to spend.

Shoshone-Bannock Tribes   , 279 F.3d at 666 (footnote omitted).

The Ninth Circuit found further support for its conclusion in § 314, by
which, the court opined, "Congress eliminated the ambiguity retroactively."        Id.
Thus, the court concluded:

> The "availability" language in the fiscal year 1996 appropriation
> either plainly limits the funds available for contract support to the
> $7.5 million appropriated for that purpose or, if we were to take the
> interpretation most favorable to the Tribes, is at best ambiguous,
> leaving room for an argument that the remaining $1.7 billion is also
> "available."  But the ambiguity, if there is any, is cleared away, both
> by the Appropriations Committee report explaining the $7.5 million
> appropriation when it was made and, with no possible ambiguity, by
> the 1999 "that's all there is" language in § 314.

Id. at 667.

Plaintiffs respond that the term "shall remain available" has a particular meaning in appropriations law: "the language in the ISD provision is about <u>when</u> a stated sum of money may be spent <u>after</u> the current fiscal year on CSCs for 'initial or expanded' contracts, not how much may be spent in the <u>current</u> year for that purpose." Appellants' Op. Br. at 35. But the two decisions of the Comptroller General plaintiffs cite in support of that interpretation do not, in our view, support it. [10] We agree with the Ninth Circuit that a better reading of the

_____

[10]In <u>Matter of Forest Service–Appropriations for Fighting Forest Fires</u>, B-231,711, 1989 WL 240615 at *2 (Comp. Gen. 1989), the Comptroller General observed that "the language 'of which $263,323,000 for . . . firefighting . . . shall remain available' . . . does not represent a line-item limitation or a cap on the amount of money available for obligation for firefighting. Rather, this language expresses the availability <u>of a specific amount</u> as to time—two years instead of one." (emphasis added) (footnote omitted). In <u>Matter of: The Honorable Thad Cochran</u>, B-271,607, 1996 WL 290140 at *1 (Comp. Gen. 1996), the Comptroller General stated that "[w]hen the Congress expressly provides that an appropriation 'shall remain available until expended,' it constitutes a no-year appropriation and all statutory limits on when <u>the funds</u> may be obligated and expended are removed." (emphasis added). Both of those decisions clearly discuss the temporal limitation the phrase "shall remain available" places on expenditures, but they do not clearly support plaintiffs' argument that the <u>amount</u> of funds specified is subject to unlimited expansion.

Furthermore, our view is supported by the Office of General Counsel of the United States General Accounting Office: "The 'shall be available' family of earmarking language presumptively 'fences in' the earmarked sum (both maximum and minimum), but is more subject to variation based upon underlying congressional intent." 2 United States General Accounting Office, <u>Principles of Federal Appropriations Law</u>, at 6-8 (2d ed. 1992). There is no evidence of an underlying Congressional intent rebutting the presumption that the "shall be

(continued...)

-23-

language is that Congress intended to limit the amount available for new or expanded CSCs to $7.5 million.

**III. Section 314**

As indicated, in October 1998, Congress passed an Emergency Supplemental Appropriations Act, which included § 314. That section stated in part that "amounts appropriated to or earmarked in committee reports for . . . the [IHS] by Public Laws . . . 104-134 [and] 104-208 . . . for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, . . . compacts, or annual funding agreements with . . . the [IHS] as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes . . . ." Pub. L. No. 105-277, § 314, 112 Stat. 2681-288 (1988). Public Laws 104-134 and 104-208 were, respectively, the Appropriations Acts for fiscal years 1996 and 1997.

The government argues we need not consider § 314 as a retroactive law; rather, it simply clarifies what Congress meant in enacting the 1996 and 1997

---

[10](...continued)
available" language fenced in the earmarked amount of $7.5 million. Indeed, to the extent there is any indicia of Congressional intent, either in the appropriations committee report or in the later-enacted § 314, it supports the conclusion that Congress intended the $7.5 million to be a maximum.

Appropriations Acts. The Tribes argue that, if we construe § 314 retroactively, it amounts to a breach of statutory and contractual vested rights.

"[I]t is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." INS v. St. Cyr, 533 U.S. 289, 316 (2001). There must, however, be "a clear indication from Congress that it intended such a result." Id.; see also Daniels v. United States, 254 F.3d 1180, 1187 (10th Cir. 2001) ("Congress . . . has the power to . . . direct [a] statute's retroactive application, but it must do so explicitly.").

Whether we view this as a retroactive law, or as merely a clarification of the prior Appropriations Acts, Congress could not have been clearer as to its intent that the Act have a retroactive effect. It specifically references prior laws enacted in prior years, both by number and by date, and specifically states that "the amounts appropriated to or earmarked in committee reports . . . are the total amounts available." Thus, Congress indisputably indicated no more funds would be available to pay CSCs for those years, and it made it very clear that that is what it intended to appropriate for those years. We therefore agree with the district court that § 314 supports its conclusion that Congress intended to make available for CSCs for new or expanded contracts in fiscal years 1996 and 1997 only $7.5 million. Further, it indicated that the earmarked amounts in the committee reports for ongoing CSCs were intended to be legally binding. And, as

we explain  infra , because any contract claim was conditioned on, and subject to, available appropriations, we reject plaintiffs' argument that § 314 breached plaintiffs' contractual and /or statutory rights.

## IV.  Contract Claims

Finally, the Tribes argue that, under the doctrine of New York Airways, Inc. v. United States , 369 F.2d 743 (Ct. Cl. 1966), "an ISDA contract binds the United States to pay even where the agency fails to seek sufficient appropriations from Congress." Appellants' Op. Br. at 2.  In New York Airways , the plaintiff helicopter company sued the government for money allegedly not paid for mail delivery.  The company was entitled by statute to receive compensation for its services, but the amounts earmarked in the appropriations act were exhausted before the end of the fiscal year.  The Court of Claims held the government was obligated to pay the helicopter service:  "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Governmental obligation created by statute."  New York Airways , 369 F.2d at 748 (citing United States v. Vulte , 233 U.S. 509 (1914)).  By contrast, however, where a "contract expressly provided that the quantities of work ordered shall be kept 'within the limits of available funds,'" and where the relevant statute "prohibited

obligating the Government to pay a larger sum . . . than covered by a specific appropriation" then work "performed in excess of the appropriation was held not to create an obligation against the Government enforceable in the courts." Id.

This case is like the latter situation, in that the government's contractual and statutory obligation to pay CSCs was expressly subject to the availability of appropriations. The doctrine of New York Airways does not therefore support the Tribes' assertion that the government is liable under contract principles despite any shortfall in appropriations. See Oglala Sioux, 194 F.3d at 1379 (rejecting the identical argument based on New York Airways, stating "Oglala's situation differs fundamentally in that the ability of Interior to bind the Government contractually was expressly conditioned on the availability of appropriations."). [11]

**CONCLUSION**

We have carefully considered all of the Tribes' arguments. For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[11]The Tribes also argue that, under United States v. Winstar Corp., 518 U.S. 839 (1996), the government may not "repudiate its own debts . . . simply in order to save money" and that "when it attempts to do so it is no more than a party breaching a contract." Appellants' Op. Br. at 46. Thus, they suggest that, whether or not appropriations were available, the government remained contractually bound. We disagree. It was always clear and explicit, both in the ISDA and in the contracts with the government, that the funding was subject to available appropriations and, despite the Tribes' repeated assertions to the contrary, there were, in fact, insufficient appropriations to permit full funding.

-27-

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 20 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHEROKEE NATION OF
OKLAHOMA; SHOSHONE-PAIUTE
TRIBES OF THE DUCK VALLEY
RESERVATION,

        Plaintiffs - Appellants,

    v.

MICHAEL O. LEAVITT, [*] Secretary
of Health and Human Services;
CHARLES W. GRIM, [**] Director of
the Indian Health Service, United
States Department of Health and
Human Services,

        Defendants - Appellees.

No. 01-7106

**ORDER**

---

[*]On January 26, 2005, Michael O. Leavitt became the Secretary of Health and Human Services. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Leavitt is substituted for Tommy Thompson as the Defendant-Appellee in this action.

[**]On August 6, 2003, Charles W. Grim became the Director of the Indian Health Service, United States Department of Health and Human Services. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Grim is substituted for Michael H. Trujillo as the Defendant-Appellee in this action.

(D.C. NO. 99-CV-092-S)

Before **MURPHY** , **ANDERSON** , and **BALDOCK** , Circuit Judges.

This matter is before us upon remand from the United States Supreme Court. The Court reversed our decision, Cherokee Nation v. Thompson , 311 F.3d 1054 (10th Cir. 2002), *rev'd* , 125 S. Ct. 1172 (2005), which affirmed the lower court's decision, Cherokee Nation v. United States , 190 F. Supp. 2d 1248 (E.D. Okla. 2001), *aff'd* , 311 F.3d 1054 (2002), *rev'd* , 125 S. Ct. 1172 (2005), and remanded the case to us for further proceedings consistent with its opinion.

We hereby recall the mandate and vacate our earlier judgment. The Supreme Court's decision requires that the judgment of the United States District Court for the Eastern District of Oklahoma be reversed. The cause is remanded to the United States District Court for the Eastern District of Oklahoma for further proceedings in accordance with the opinion of the United States Supreme Court.

It is so ordered. The mandate shall issue forthwith.

Entered for the Court
PATRICK FISHER, Clerk of Court

By:
    Deputy Clerk